when the Cayuga stopped, and it would have entailed no danger of a collision had not the Cayuga started her engine again before the ferry boat had fairly passed. This starting up of the Cayuga when she did, brought the two into close proximity, and it was manifest when the Cayuga thus started up, that at the best she must shave the ferry boat very closely. The two vessels were by this movement brought into dangerous proximity, and the boat attempting the manoeuvre must be held responsible for the failure to successfully accomplish it. Furthermore, the statement of the pilot of the Cayuga is, that he made no effort at all to swing his bow to west when the danger of collision became imminent, although the ferry boat was moving past his bow, and although a swing of ten or fifteen feet would have carried him clear. The excuse of the pilot for this inaction is, that it would have required two full turns of the wheel to swing the bow of the Cayuga ten feet, and that there was not time to make these turns. If such be the fact with regard to this boat, it makes clearly manifest the impropriety of starting her engine when within such a short distance of a vessel ahead. If such be not the fact, it was an additional fault in the pilot not to attempt to shift his wheel, while, if, as is stated by some of the witnesses, he did shift his wheel, and was swinging to west at the blow, the positive denial of the fact by the pilot casts doubt upon the claimant's theory of the case; resting so largely as it does upon his testimony.

---

## Case No. 2,537.

### The CAYUGA.

[7 Blatchf. 385.][1]

Circuit Court, E. D. New York. June 18, 1870.[2]

COLLISION BETWEEN STEAM VESSELS — CROSSING COURSES — FOURTEENTH SAILING RULE — DAMAGES—USE OF INJURED VESSEL—EVIDENCE.

1. The 14th rule of the act of April 29, 1864 (13 Stat. 60), which requires, that, if two ships

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[2] [Affirming Case No. 2,536. Decree of circuit court affirmed in The Cayuga v. Hoboken Land & Imp. Co., 14 Wall. (81 U. S.) 270.]

---

under steam are crossing, so as to involve risk of collision, the ship which has the other on her own starboard side shall keep out of the way of the other, and the 18th rule of the same act, which requires that, where one of the two ships is, by the 14th rule, to keep out of the way, the other shall keep her course, applied.

[See note at end of case.]

2. A ferry-boat was disabled by a collision with another vessel, through the fault of the latter. To guard against interruption of the public use of the ferry from such or like causes, the owners of the ferry kept always ready for service a spare boat, which was idle except when some other boat was disabled, and which immediately took the place of the disabled boat. There was, by reason of the special character of the business of ferriage and of the boats used therein, no general demand in the market for such boats, but witnesses experienced in such business stated the value of the use of a boat such as the one that was injured: Held, (1.) That the owners were entitled to recover the fair value of the use of the injured boat during the period required for her repair, notwithstanding her place was supplied by such spare boat, which might otherwise have been idle; (2.) That it was not erroneous to estimate the value of such use at the rate or amount stated by witnesses experienced in the special business of ferriage in the waters about the city of New York, where the disabled boat was employed.

[Cited in The Favorita, Case No. 4,695; The Favorita v. Union Ferry Co., 18 Wall. (85 U. S.) 603; The Potomac v. Cannon, 105 U. S. 632; Coffin v. The Osceola, 34 Fed. 921; New Haven Steamboat Co. v. Mayor, 36 Fed. 718; The Margaret J. Sanford. 37 Fed. 152; The Emma Kate Ross, 46 Fed. 874.]

[See note at end of case.]

[In admiralty. Libel by the Hoboken Land & Improvement Company, owner of the steam ferry-boat James Watt, against the steamer Cayuga to recover damages caused by collision. There was a decree for libellants in the district court (see Cases Nos. 2,535 and 2,536); and the Hudson River Steamboat Company, claimants of the Cayuga, appeal.]

William J. A. Fuller, for libellants.
Cornelius Van Santvoord, for claimants.

WOODRUFF, Circuit Justice. The ferry-boat James Watt, owned by the libellants, left her slip at Hoboken, bound for her slip at the foot of Barclay street, on the opposite side of the river. Her course was obliquely downward across the river. At about the time, or very soon after, she left her slip at Hoboken, the steamer Cayuga left the slip at the foot of Desbrosses street, on the New York side of the river, rounded to, opposite Hubert street, and then took a course down the river. The two vessels collided opposite or above Chambers street.

There is some conflict of testimony in regard to the precise heading of the Cayuga, as she proceeded down the river. I think the preponderance of the testimony is, that she was headed in the direction of the docks of the Central Railroad Company, on the west side of the river, below Jersey City— a direction across the river. though less oblique thereto than the course of the James

Watt, crossing from the west side. I do not, however, deem this conflict of testimony very important, because, whether the Cayuga's course was a little more or a little less inclined to the westward, it was perfectly certain that the courses of the two vessels were inclined to each other, and must and did cross each other. Each vessel was seen from the other at about the same time; and the fact that their respective courses crossed each other, was necessarily obvious to any intelligent observer. The Cayuga had the James Watt on her starboard side, and the 14th of the rules of navigation (Act April 29, 1864; 13 Stat. 60) is explicit, that, "if two ships under steam are crossing, so as to involve risk of collision, the ship which has the other on her own starboard side shall keep out of the way of the other;" and the 18th rule requires, that, when one of the two ships is, by the above rule, to keep out of the way, the other "shall keep her course." If the situation and courses of the two vessels were such as to bring them within these two rules, then it was the clear duty of the Cayuga to keep out of the way of the James Watt, and permit her to keep her course, which, on the other hand, it was the duty of the latter to do.

(1) They were crossing. Neither could proceed to her destination down the river without crossing. Both knew that their courses were crossing. The Cayuga knew that the James Watt was a ferry-boat running on the Hoboken ferry, obliquely across the river, from Hoboken to Barclay street. She, therefore, knew that she could not pass down, whether in the line of the current or obliquely to the westward, without crossing the track of the ferry-boat; and the James Watt knew, with like certainty, that she could not go to Barclay street without crossing the course of the Cayuga.

(2) Was there risk of collision? It was perfectly certain that, if each kept its course, one of three things must happen—the Cayuga must cross the bow of the James Watt; or the James Watt must cross the bow of the Cayuga; or that must happen, which, in fact, did happen, namely, the boats must collide. Whichever of the two boats was moving with the greater speed, whether the Watt, when first seen from the Cayuga, was a little farther up stream than she was or not, it is, I think abundantly established by the testimony of the witnesses, that, from the time the vessels had approached within three hundred yards of each other, there was obvious risk of collision, if neither changed her course. Not such risk that there was instant peril, nor a danger which might not have been avoided, but just that risk which the 14th rule contemplates, and which brought that rule to bear upon both vessels, making it the duty of the Cayuga to keep out of the way of the Watt, and not merely permitting, but requiring the Watt to keep her course.

The proof in the district court was deemed to warrant the conclusion, that, when nearing the point of intersection, the Cayuga stopped, and then, and after she had misled the Watt into the belief that there was no further danger, started ahead and ran into the Watt. It is claimed, that the additional proofs taken in this court on behalf of the Cayuga show that no such stopping and then starting ahead took place after the Cayuga left the docks opposite Hubert street. I do not deem it necessary to settle that disputed point, although the testimony that such stopping did take place at a time when, if it had continued but for less than a minute longer, no collision could have occurred, is very strong and explicit. But, taking the statement of the Cayuga's witness, it only places the Cayuga in a category hardly less desirable, namely—she did absolutely nothing to keep out of the way—she kept her course—she completely reversed the rule, expecting, as her witnesses say, that the Watt, which they allege was moving at the greater speed and was already ahead of her, measuring by a line at right angles across the river, would give way, slow, and go under her stern. This is precisely what the Cayuga's witnesses say they expected, and what some of them say the Watt ought to have done; and yet some of them testify that the Watt was moving faster than themselves and that her position was in advance of the Cayuga, if judged by a line drawn directly across the river.

I do not deem it important to determine which of these boats was moving at the greater speed. Great stress is laid by the counsel for the Cayuga on the testimony that her speed was less than that of the Watt. I think the balance of evidence is the other way. But the rule of navigation above referred to is not dependent on that question. It has no such qualification as that the vessel having the other on her own starboard side shall keep out of the way of the other, provided such other is moving at a less speed than herself. Indeed, if the Cayuga saw the Watt approaching on a track that crossed her own, as above stated, as she certainly did, and also thought, as her witnesses now testify, that the speed of the Watt was greater than her own, the stronger and more conclusive was the reason why she should not attempt to cross the bow of the Watt, and the greater, also, was the propriety and urgency of the rule mentioned and the more obvious its application.

But it is earnestly insisted that the Watt, in pursuing her way down, had come into a course parallel with that of the Cayuga, in which position there was no danger, and that, in such circumstances, the Watt, having, also, the greater speed, is to be regarded as a vessel overtaking another, to which another and opposite rule (rule 17th) applies, and that, under this rule, it was the duty of the Watt, the overtaking

vessel, to keep out of the way of the other. I am constrained to say, after a pains-taking examination of the proofs, that the balance of testimony is against the facts upon which this theory rests; and that the Watt can, in no just sense, be regarded as overtaking the Cayuga. It is quite possible that, in turning an entire circle, as the Cayuga did at or near Hubert street, the Watt was at one time in view over her starboard quarter. So, it is quite possible, that, afterwards, as the Cayuga proceeded obliquely down the river, the Watt appeared to be relatively in advance. But the evidence satisfactorily shows, that the Watt at no time had the Cayuga ahead of her, in view of any of the persons on board the Watt, so as to be herself either following or overtaking the Cayuga; and I think it fully proved that the Watt did not change her course. She did undoubtedly cross the bow of the Cayuga; and great stress is laid on that by the counsel for the claimants. But this was because her course crossed that of the Cayuga, and it was her duty to keep her course, so that she might not mislead the other, but leave her to keep out of the way, as the law required.

The testimony is very voluminous, and the case for both parties has been argued with great ability and zeal. The counsel for the claimants has exhibited unusual ingenuity and skill in presenting the best possible excuse for the Cayuga in setting the rules of navigation at defiance, and relying on an expectation that the Watt would give way and pass under the Cayuga's stern; but, in my judgment. the situation and course of the two vessels was plainly within the 14th rule, and the collision was solely due to a neglect of its observance by the claimants' vessel.

On the question of damages, the only exception argued on the appeal is, whether the allowance of $75 per day, for the loss of the use of the ferry-boat during the period required for repairing her, was properly allowed. There is no demand, in the general market for ferry-boats. They are built for a special use, and generally adapted, in some degree, to the particular ferry upon which they are intended to run. The libellants did not hire, and possibly might have been unable to hire, another ferry-boat to take her place on the ferry. These very reasons have compelled the libellants to build and keep another boat, which they can use when accident or other cause disables one which they have in daily use.

It is quite obvious, that there is neither justice nor equity in allowing to a tort-feasor the benefit of this large outlay made by the libellants to enable them to serve the public and run their ferry without interruption; and yet that is the effect of yielding to the argument that. because such spare boat was already in the libellants' possession, and was used, therefore the libellants sustained no

pecuniary loss by the delay. If it be conceded that a just allowance for the necessary cost of another boat, hired at its fair value to perform the service, would be necessary to the indemnity of the libellants, there is no sound reason, I think, for withholding such allowance when the libellants furnish the substituted boat themselves. True, the libellants have chosen to submit to the loss of the use of their substituted boat during that portion of the year when their other boats are not disabled; but that is not and ought not to. be made a premium to tort-feasors whose wrongful acts compel the libellants to incur such loss in order to the satisfactory conduct of their business. In the case of The Rhode Island [Case No. 11,-744], an allowance of a sum which would have enabled the libellant to supply the place of an injured vessel, was affirmed by Mr. Justice Nelson, although, in fact, the place of the injured vessel was not supplied at all. The principle of indemnity is uniformly recognized as just, and its measure must be the same, whether a substitute is furnished by the libellant or procured from another. The difficulty in this particular case arises from the peculiarity of the business and the want of demand for such boats; and, in such case, I am not satisfied that the view of the subject taken by the judge of the district court is erroneous. My sense of justice wholly approves it. To withhold compensation is, to my mind, obvious injustice. Where the proof of what such a boat could have been let for upon hire or charter is practicable, as in the cases relied upon by the claimants, that is a just measure. The whole subject has been much debated, and no rule which is adapted to every supposable case can be deemed established. It is not true that the use of this boat has, in fact or in law, no value. The testimony of witnesses conversant with the subject, and of long experience, proves the contrary. The case is special and peculiar, and I think the allowance just and reasonable. The decree must be affirmed. with costs. 1 Ben. 171, and 2 Ben. 125 [Cases No. 2,536 and 2,535].

[NOTE. The Hudson River Steamboat Company, claimants of the Cayuga, appealed to the supreme court, where the decree of the circuit court was affirmed, Mr. Justice Clifford delivering the opinion. The ground of the affirmation is stated to be that even if the Cayuga did nothing to mislead the Watt, as claimed by libellants, yet it was clear that she did not keep out of the way, as required by the 14th sailing rule, which provides that, "if two ships under steam are coming so as to involve risk of collision, the ship which has the other on her starboard side shall keep out of the way of the other;" that the circuit judge was correct in deciding that under all the circumstances the rule was applicable in this case, and that, consequently, the fault of the collision lay with the Cayuga. Furthermore, the court held that the exceptions to the commissioner's report were properly overruled, and that the allowance of $75 per day while the Watt was undergoing repairs was properly made. The Cayuga v. Hoboken Land & Imp. Co., 14 Wall. (81 U. S.) 270.]