OTTE, APPELLEE, *v.* AMERICAN AIRLINES, INC., APPELLANT.

(No. 24177—Decided October 10, 1957.)

*Mr. Richard C. McConnell,* for appellee.
*Mr. T. Edward McNamara, Mr. Robert J. Gemperline* and
*Mr. Paul C. Wagner, Jr.,* for appellant.

SKEEL, J. This appeal on questions of law comes to this court from a judgment for the plaintiff entered after trial of the issues joined by the pleadings, upon the verdict of a jury in the Municipal Court of Cleveland. The action is one in negligence.

The plaintiff holds a private pilot's license issued by the Civil Aeronautics Board and at the time here in question owned a "Bellanca" four-seated airplane powered by a single 150 horsepower engine. The defendant, a commercial airline, was the owner, among other property, of a DC-6 four-motored cargo plane which had been in the hangar at the southeast end of the Cleveland Hopkins Airport in Cleveland, where one of its motors had been replaced just prior to the incidents hereafter related. The Cleveland Hopkins Airport is an International Airport under the control of the Civil Aeronautics Board. All movements of airplanes to, from and in this airfield are controlled from the control tower under the authority of the Civil Aeronautics Board, and all licensed pilots are required to call for, receive and follow instructions when arriving, leaving or moving to go to or from a gate, hangar line or otherwise at the port.

Just shortly prior to the time the plaintiff landed his plane at Cleveland Hopkins Airport, the defendant, after requesting permission, and at the direction of the tower, taxied its DC-6 to the south end of runway 32 for "run up" purposes. The defendant's mechanic testified:

"We called the tower for a run up area and they directed us to the southeast corner."

When the plane arrived at the "run up" position, as directed by the tower, its motors continued to "idle" and the "run up" process, which it was said ordinarily takes, under these circumstances, forty-five minutes to complete, was commenced. Certain stages of the "run up" process require the revving (speeding the motors up to 2100 r. p. m.) of one or more of the motors. There were three of defendant's employees engaged in the "run up," two mechanics and a flight engineer. They were, as was usual, inside the plane and, because of its construction, could not see the area of the field to the rear of the place where the plane was standing. The most southerly part of runway 32 ends at the east side of the field at the easterly end of an east-west taxi strip and also at the south end of a taxi strip to the east of runway 32 and the taxi strip in front of the hangars and hangar line at the east side of the field. There is a triangular plot of sod between runway 32 and the taxi strip to the east, which is about 200 feet wide at its northerly end. The DC-6 was standing facing south, 50 feet from the end of the runway for the "run up." The length of the plane was 107 feet, and the tail extended northerly to within 50 feet of the grass plot.

The plaintiff, after getting permission to land from the tower, landed in runway 18, which intersects runway 32 almost directly opposite the tower in about the center of the airport. After he turned off the active runway, having been ordered to wait for a commercial plane to take off, he testified he was given permission to "taxi to the hangar line" without direction as to what runways or taxiways to use. Wanting to meet a friend at the south end of the field, he started south on runway 32 which he said was then inactive. When he got within 400 or 500 feet of the DC-6, he stopped. His testimony is as follows:

"I got up in here, and I saw this American DC-6 down here with its engines idling. Why it was there—I thought they were waiting for clearance from the control tower to taxi out some place, so I stopped. I thought the situation over, and I saw these engines were just going around slowly. I mean, we are very familiar with some terms as a person would be with an automobile, or—so I didn't want to go too close to the back of him—I'd say this is three to four hundred feet—so I started

to cut across the side, here, and knowing that the control tower knows that this plane is there, the control tower should know I am taxiing here. I had no warning from the control tower whatsoever, so I proceeded to go over here, making very sure that I was staying at a clear distance because there is a little wind from an airliner.

"* * *

"As I proceeded behind them—I didn't know there were two mechanics in the ship, which I found out afterwards. They proceeded to rev all four of their engines up, putting their propellers into full pitch. I don't know whether that is the fact, or not, but that is what the mechanic stated. It only causes more turbulence, which is equivalent to a hurricane. So my ship turned right around just like a weather vane on top of a building. You have to think fast. You work your throttle with your hand. It is the same as if you push with your foot, where you accelerate with your foot. When you are taxiing, you are holding your control wheel, and pushing the throttle, working it not to taxi too fast. You have to slow down, and just watch yourself.''

At the time the ''air turbulence'' hit plaintiff's plane, it was in about the middle of the sod area. He did not ask permission or notify the tower of his intention to leave runway 32, nor is there any claim that the tower notified defendant's mechanics of plaintiff's presence in turning east over the sodded area. The plaintiff's plane was damaged when its left wing hit the sod when tipped up from the ''air turbulence'' caused by defendant's mechanics in revving up the motors of the DC-6 as a necessary part of the ''run up.''

The plaintiff alleges the following acts of negligence in his petition:

"1. That the defendant applied full power to the four engines of its airplane while parked in the immediate vicinity of an active taxiway without first ascertaining that the same could be done in safety, all of which he could and should have done.

"2. That the defendant failed to maintain a look out behind his aircraft when he applied power to the engines.

"3. That the defendant failed to monitor or listen to the Cleveland Hopkins Airport Tower and respond to its instructions.

"4. That the defendant failed to keep a lookout for approaching aircraft."

The defendant's claims of error are:

"1. The trial court erred in overruling defendant's motion for a directed verdict at the close of all the evidence.

"2. The trial court erred in overruling defendant's motion for a judgment notwithstanding the verdict.

"3. Misconduct on the part of plaintiff's attorney in the course of final argument to the jury.

"4. The amount of damages awarded by the jury is not supported by the evidence and is manifestly against the weight of the evidence.

"5. The court erred in overruling defendant's objection to certain testimony of the plaintiff.

"6. The court erred in overruling defendant's motion for a new trial."

The question of what would be negligent conduct in the use of the facilities of a "tower controlled" airport managed under the authority of the Civil Aeronautics Board is one of fact, to be established by evidence of the rules properly promulgated and followed and of the customs generally accepted as necessary for the safe use of such port. The speed with which airplanes (of necessity) take off and land and the need to make certain, so far as is possible, that an airplane is in mechanical condition for safe flight (in this record referred to as "run ups") circumscribes the whole operation with the necessity of absolute compliance with rule and custom. Where the means exist of determining with absolute certainty what the conduct of another will be, one who is dependent on such conduct for his own safety does not satisfy the common-law rule of ordinary care by attempting to assume or guess what will be done rather than using the facilities readily available to make certain that he may proceed, as intended, with safety.

The first, second and sixth claims of error must be sustained. The defendant, with direction from the tower, was in the act of testing its plane for flight. It was doing what it had asked permission to do ("run up") at the place it was directed to do it. The fact is undisputed by the evidence that the mechanics in charge of the work could not see to the rear of the

plane while testing the motors, nor was it necesary or customary that anyone be stationed on the ground outside the plane to warn others of air turbulence created as a necessary part of such tests. The defendant's mechanics had earphones on to receive any communication that might be relayed from the tower. The plaintiff, with the means at hand to make his position known, and with full knowledge that defendant's plane was standing on runway 32 with its motors running, turned directly into the path of whatever air turbulence might be created by revving the DC-6 motors as a part of the ''run up,'' a circumstance that could reasonably have been anticipated by the plaintiff. There is no evidence in the record of any negligence on the part of the defendant, as charged by the plaintiff, and the court should have granted defendant's motion for a directed verdict, and, having failed to do so, should have granted defendant's motion for judgment notwithstanding the verdict. Sustaining error No. six would follow as a matter of course for the same reasons.

In sustaining the third assignment of error, it is sufficient to say that counsel for plaintiff should not by argument attempt to put in evidence facts which have not been put before the jury by the testimony of witnesses, and where such procedure is attempted the court is required to instruct the jury to disregard such attempted statements of fact as part of a concluding argument.

The fourth assignment of error deals with the subject of damages. The rule of damages to an airplane is the same as to any other personal property. It is the difference between the market value of the plane just before and just after the damage has occurred. The repair bill is some evidence of such damage. *Wooster Feed Mfg. Co. v. Village of Tallmadge*, 82 Ohio App., 499, 81 N. E. (2d), 811. The plaintiff's evidence, dealing with damages, was contradictory and did not deal with any decrease in value after repair. If, after repair, the plane was completely restored to the value it had before the damage, any amount assessed as damage in excess of the repair bill would be excessive. Likewise the loss of use of an airplane must be based on what the value of the use is as used by the owner, and not what was expended for other means of transportation.

An examination of the charge, while not complained of by the defendant, needs a brief comment. It does not contain an explanation of the rule of "proximate cause," nor is the rule for determining damage properly set forth. In defining negligence and contributory negligence, the jury was told "so, summing it up, before this plaintiff can recover, he has to establish that the other party was negligent and he, himself, was free from negligence." Certainly the omission of matters so vital to the rights of the parties and a misstatement of the fundamentals of the law of negligence, while in this case in part only of interest to the prevailing party in the trial court, in reality, must be prejudicial to the unsuccessful party in that court as well. They are not only errors of omission but of commission.

For the foregoing reasons, the judgment for the plaintiff is reversed and final judgment entered for the defendant.

*Judgment reversed.*

Hurd and Kovachy, JJ., concur.