PRESENT: Hassell, C.J., Lacy, Koontz, Kinser, Lemons, and Agee,
JJ., and Stephenson, S.J.

MCI WORLDCOM NETWORK SERVICES, INCORPORATED

OPINION BY
v.  Record No. 030312    SENIOR JUSTICE ROSCOE B. STEPHENSON, JR.

OSP CONSULTANTS, INCORPORATED          September 12, 2003


UPON A CERTIFIED QUESTION FROM THE UNITED STATES
COURT OF APPEALS FOR THE FOURTH CIRCUIT

Pursuant to Article VI, Section 1 of the Constitution of

Virginia and Rule 5:42, the United States Court of Appeals for

the Fourth Circuit (the Fourth Circuit), by an order entered

February 10, 2003, certified to this Court the following

question:

Is a telecommunications services carrier entitled
to damages for the loss of use of a fiber-optic cable
damaged by a defendant when the carrier intended to
have the full capacity of the damaged cable available
for its use should the need have arisen, but the
carrier was able to accommodate within its own network
the telecommunications traffic carried by the damaged
cable and the carrier presented no evidence that it
suffered loss of revenue or other damages during the
time that the cable was unavailable?

I

MCI WorldCom Network Service, Incorporated (MWNS) provides

telecommunications services through underground fiber-optic

cables.  On March 27, 2000, OSP Consultants, Incorporated (OSP)

severed one of MWNS's underground fiber-optic cables while

excavating near Centreville, Virginia.  Consequently, MWNS sued

OSP in tort, based upon theories of negligence and trespass,

seeking repair costs of $32,509.33 and $454,484.10 for loss of use of the severed cable.

OSP conceded liability, and, in a subsequent bench trial in the United States District Court for the Eastern District of Virginia, the district court awarded MWNS the repair costs of $32,509.33. The district court, however, refused to award damages for loss of use, and MWNS appealed that ruling to the Fourth Circuit.

On February 10, 2003, the Fourth Circuit certified the above-quoted question. By an order entered March 6, 2003, we accepted the question.

II

The relevant facts, as set forth in the certification order, are not in dispute. The severed underground fiber-optic cable was one of MWNS's primary transmission routes for telecommunications traffic along the East Coast. The cable carried voice and data traffic as well as high-speed data transmission for banks and credit card companies. Like other telecommunications providers, MWNS has built into its network excess capacity to allow for varying levels of traffic and to permit traffic to be re-routed, and service maintained, in the event of an outage in one part of its network.

In the telecommunications industry, a "DS-3" is a standard unit of capacity, and one DS-3 represents 672 voice circuits or

2

individual telephone calls.  The cable severed by OSP had a total capacity of 960 DS-3s.  The number of active DS-3s varies from moment to moment, depending on the volume of traffic.  When the cable was severed, 222 DS-3s were active, and more than 3000 voice calls were lost or blocked, as was some amount of private-line and Internet traffic.  MWNS, however, was able to quickly re-route the traffic carried by the severed cable because of the excess capacity built into its network.  A computer effected this rerouting automatically.

On the day that OSP severed MWNS's cable near Centreville, MWNS suffered another cable break in Pennsylvania.  MWNS ordinarily could have used the excess capacity in the Centreville cable to handle the traffic re-routed from the Pennsylvania cable.  Nothing in the record, however, suggests that MWNS had any difficulty re-routing within its network the traffic from both broken cables.

Although traffic was not fully restored to the Centreville cable for more than thirteen hours after it was severed, MWNS sought recovery for only seven-and-one-half hours of lost use of the cables; i.e., four-and-one-half hours to make the physical repairs to the cable and three hours to "normalize" the traffic that had been re-routed.  MWNS arrived at its loss-of-use damages by consulting the tariff rates filed by competitors Sprint and AT&T to determine the per-hour cost of procuring

3

substitute DS-3s.  Sprint's tariff rate, the lower of the two, for one DS-3 was $45,448.41 for one month.  Thus, MWNS calculated that replacing 960 DS-3s, or the entire capacity of the severed cable, for one month would cost $43,630,473.60 and that replacing 960 DS-3s for one hour would cost $60,597.88.  MWNS then multiplied the hourly rate by the seven-and-one-half hours the cable was unavailable and arrived at $454,484.10 in loss-of-use damages.  MWNS did not attempt to assign any economic value to the traffic that was lost at the moment the cable was severed, and it presented no evidence that it lost customers or revenue as a result.

III

MWNS contends that it is entitled to loss-of-use damages measured by the cost of replacing 960 DS-3s for seven-and-one-half hours even though it was able to accommodate within its own network all the telecommunications traffic carried by the damaged cable.  In other words, MWNS seeks to recover the reasonable cost of obtaining replacement property even though it did not, in fact, obtain a replacement.

OSP concedes that loss-of-use damages may be recovered in appropriate cases.  OSP contends, however, that MWNS suffered no damages from the loss of the use of its cable because it had within its own network the capacity to handle all the traffic carried by the damaged cable.  OSP asserts that to award MWNS

4

loss-of-use damages under the circumstances would "bestow a massive and unfair windfall."

We have recognized that loss of use is a compensable element of damages for the detention of personal property. See e.g., Vines v. Branch, 244 Va. 185, 190, 418 S.E.2d 890, 894 (1992); Shearer v. Taylor, 106 Va. 26, 28, 55 S.E. 7, 8 (1906). In Shearer, the plaintiff had her furniture in storage under a 12-month storage contract. While the furniture was in storage, a creditor of the plaintiff had a distress warrant levied on the furniture. The furniture remained in storage for approximately six months after being released from the levy. The plaintiff sued the creditor, claiming damages for the wrongful levy, including damages for the loss of use of the furniture during the time it was held under the warrant. The jury returned a verdict in favor of the plaintiff. 106 Va. at 27-29, 55 S.E. at 7-8.

At trial, the jury was instructed "to allow a fair rental value for the property during the time it was held under levy, considering the character of the property levied on." Id. at 28, 55 S.E. at 8. The jury was further instructed that "the measure of damage in this case is: (1) A fair rental value of the property levied on for the period that same was held under the distress warrant, not exceeding twelve months; (2) the

5

damage to the same occasioned by the storage during the same period." Id.

We reversed the judgment and remanded the case for a new trial, holding that the jury was improperly instructed about the measure of damages that plaintiff could recover. We acknowledged the general principle that the value of the use of property during an unlawful detention is an appropriate element of damages. Id. We concluded, however, that, because the furniture at issue had been in storage when it was detained and remained in storage for six months after it was released from levy, the

> evidence tended to show that the plaintiff had not been deprived of the use of the property at all . . . . If no use of the property was contemplated by the plaintiff, she suffered no loss of use in consequence of the levy, and therefore was not damaged. The effect of the instruction given was to exclude from the jury all consideration of the evidence tending to show that the plaintiff had suffered no loss of use of the property, and to require them to ascertain its rental value without regard to whether or not injury had been suffered as a result of the levy.

Id. at 29, 55 S.E. at 8.

Shearer tends to support OSP's contention that a plaintiff must actually be deprived of the use of property in order to obtain loss-of-use damages. Shearer also suggests, however, that the mere intention to use the property may be sufficient to

6

support a damage award. Therefore, Shearer does not provide a clear answer to the certified question.

Two leading cases relating to the question were decided by the United States Supreme Court. Both are maritime cases, and they reach opposite results. One of these cases, relied upon by MWNS, is The Cayuga, 5 F.Cas. 326 (E.D.N.Y. 1868) (No. 2,535), aff'd, 5 F.Cas. 329 (C.C.E.D.N.Y. 1870) (No. 2,537), aff'd, 81 U.S. 270 (1871). The other case, relied upon by OSP, is Brooklyn Eastern District Terminal v. United States, 287 U.S. 170 (1932).

In The Cayuga, a ferry was damaged in a collision with a steamer. The owners of the ferry had a spare boat that was used while the ferry was being repaired. Consequently, the owners suffered no pecuniary damages during the time that the ferry was out of commission. 5 F.Cas. at 327. The circuit court concluded, however, that the ferry owners were entitled to compensation for the loss of use to be measured by the reasonable cost of hiring a substitute boat, even though no such substitute was needed. The court reasoned as follows:

> It is quite obvious, that there is neither justice nor equity in allowing to a tort-feasor the benefit of this large outlay made by the libellants to enable them to serve the public and run their ferry without interruption; and yet that is the effect of yielding to the argument that, because such spare boat was already in the libellants' possession, and was used, therefore the libellants sustained no pecuniary loss by the delay. If it be conceded that a just

7

> allowance for the necessary cost of another boat, hired at its fair value to perform the service, would be necessary to the indemnity of the libellants, there is no sound reason . . . for withholding such allowance when the libellants furnish the substituted boat themselves. . . . The principle of indemnity is uniformly recognized as just, and its measure must be the same, whether a substitute is furnished by the libellant or procured from another.

5 F.Cas. at 331. The Supreme Court affirmed the circuit court's decision. 81 U.S. at 279.

In Brooklyn Terminal, decided approximately 60 years after The Cayuga, the Supreme Court reached a different result on somewhat similar facts. In Brooklyn Terminal, a dredge belonging to the United States collided with a tugboat that towed car floats for railroads. The tugboat was damaged, and, while it was being repaired, the owner did not obtain a substitute tug. Instead, the tug owner worked its other two tugs overtime. No evidence was presented to show that the overtime use of the other tugs caused the owner to incur additional expenses. 287 U.S. at 172-73. The Supreme Court unanimously concluded that it would be "[e]rroneous and extravagant" to award the tug owner loss-of-use damages measured by the amount it would have cost to hire a substitute tug "when there was no need of such a boat to keep the business going, and none in fact was used or paid for." Id. at 174.

In reaching this conclusion, the Court wrote the following:

8

The disability of a vessel will not sustain demurrage at the rate of the value of her hire unless an award at such a rate can be seen to be reasonable when the disability is viewed in the setting of the circumstances. Only when thus enlightened can we choose the yardstick most nicely adjusted to be a measure of reparation, in some instances, no doubt, the hire of another vessel, in other instances, it may be, a return upon the idle capital, in others something else. Only then indeed can we know whether the interference with profit or enjoyment is to be ranked as substance or as shadow. The vessel may have been employed in a business of such a nature that for the avoidance of loss there is need of the employment of a substitute. In such circumstances the fair value of the hire may be an element of damage, and this whether the substitute is actually procured or not. . . . We are to have regard in every case to the reasonable probabilities of time and place and circumstance. Demurrage on the basis of the cost of a substitute, actual or supposititious, may be no more than fair indemnity when gains have been lost or enjoyment seriously disturbed. Demurrage on a like basis may be so extravagant as to outrun the bounds of reason when loss of profit has been avoided without the hire of a substitute and the disturbance of enjoyment has been slight or perhaps fanciful.

Id. at 174-76 (citations omitted). The Court specifically

distinguished "spare boat" cases like The Cayuga as follows:

The doctrine of the "spare boat" cases is invoked by the petitioner as decisive in its favor, but we think without avail. Shipowners at times maintain an extra or spare boat which is kept in reserve for the purpose of being utilized as a substitute in the contingency of damage to other vessels of the fleet. There are decisions to the effect that in such conditions the value of the use of a boat thus specially reserved may be part of the demurrage. If no such boat had been maintained, another might have been hired, and the hire charged as an expense. The result is all one whether the substitute is acquired before the event or after. . . . [H]owever, . . . there has been a refusal to extend the doctrine to

9

> boats acquired and maintained for the general uses of
> the business. . . .
>
>      So here.  The petitioner was engaged in an
> established business using tugs for a single purpose.
> It had no thought to turn that business into one of a
> different kind while this tug was out of service.
> Mindful of the need to minimize the damages, it used
> to the full its available resources, and was able by
> special effort to make them do the work.  We are
> unable to accept the argument that the expenses which
> it saved are to be charged to the respondent as if
> they had not been saved at all.

Id. at 176-77 (emphasis added) (citations omitted).

MWNS contends that the extra capacity that it built into its fiber-optic network and that allowed it to accommodate the traffic carried by the damaged cable is the functional equivalent of the spare boat used in The Cayuga.  OSP contends, on the other hand, that the present case is much closer to Brooklyn Terminal because MWNS simply made additional use of the available capacity on its own network, extra capacity that was "acquired and maintained for the general uses of the business."

IV

We do not agree with MWNS's contention.  In the present case, the evidence shows that MWNS maintains excess network capacity primarily for the general use of its business so that it can accommodate varying levels of telecommunications traffic. While it is true that the excess capacity enables MWNS to reroute traffic in the event of emergencies, MWNS does not reserve particular cables for use exclusively in emergencies, as

10

in the "spare boat" cases.  Accordingly, consistent with the holding in <u>Brooklyn Terminal</u>, we hold that, in the circumstances of this case, MWNS is not entitled to loss-of-use damages, and we answer the certified question in the negative.

<u>Certified question answered in the negative</u>.