[Cite as *MCI Communication Servs. v. Barrett Paving Materials, Inc.*, 2012-Ohio-1700.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

MCI COMMUNICATIONS SERVICES,   :       APPEAL NO. C-100806
INC., d/b/a VERIZON BUSINESS,        TRIAL NO.  A-0709016

      :

    Plaintiff-Appellant,

      :        *O P I N I O N.*

  vs.

      :

BARRETT PAVING MATERIALS,
INC.,       :

    Defendant-Appellee.       :

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed from is:  Affirmed

Date of Judgment Entry on Appeal:  April 18, 2012

*James J. Proszek*, Pro Hac Vice, and *Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, and *Peter Burrell*, and *Strauss & Troy*, for Plaintiff-Appellant,

*Rendigs, Fry, Kiely & Dennis, L.L.P.*, *Peter L. Ney* and *Michael J. Chapman*, for Defendant-Appellee.

Please note:  This case has been removed from the accelerated calendar.

**CUNNINGHAM, Judge.**

{¶1}     Plaintiff-appellant MCI Communication Services, Inc., d/b/a Verizon Business ("MCI"), appeals the Hamilton County Common Pleas Court's entry of partial summary judgment for defendant-appellee, Barrett Paving Materials, Inc., ("Barrett") on the issue of loss-of-use damages.  Because MCI failed to present proper evidence from which to measure any damages from the loss of use of its negligently severed fiber-optic cable, we affirm the trial court's judgment.

I.   Background Information

{¶2}     MCI provides telecommunication services to individual and commercial customers through a nationwide network of underground fiber-optic cables.  In December 2005, Barrett negligently severed one of MCI's fiber-optic cables while excavating a trench in Sharonville, Ohio, near Cincinnati.  The cable, installed in 1997 by a predecessor company, runs between Cincinnati and Dayton.

{¶3}     The severed cable contained 96 separate glass fibers that carried 19 active transport systems for telephone calls and data.  The transport systems also contained "emergency diversity."  MCI described this emergency diversity as a backup route for other transport systems within its fiber-optic network.  This emergency diversity is part of MCI's redundancy scheme, which is both integral to and fully integrated within MCI's network.

{¶4}     According to MCI, the severed cable presented the whole fiber-optic network with a total capacity of 1,920 DS-3s.  One DS-3 contains 672 voice grade circuits, the equivalent of 672 individual telephone calls.  MCI claimed that all of this capacity had been impacted by Barrett's severance of the cable.  And MCI identified complaints from at least 51 separate customers indicating that their dedicated service

2

had been temporarily interrupted after Barrett's severance of the cable. MCI had also presented evidence that the service of an additional 123 customers had been affected by the severance of the cable. MCI's documents demonstrated that after six hours and 41 minutes no customer traffic remained blocked, but customers may have lacked diversity until MCI completed the repair.

{¶5} MCI brought this action against Barrett alleging negligence, trespass, and a statutory violation. In addition to repair costs for splicing in a new 300 foot section of cable, MCI sought damages in the amount of $522,594.22 for "loss of use of the cable." According to MCI, as a result of the severing, it lost the ability to use the fibers in the cable to carry capacity. In addition, MCI claimed the transport systems on the severed cable were compromised because they operated without a backup when the impacted traffic was rerouted to "spare" capacity on other cables. As MCI explains, it promises and its customers expect that its redundancy scheme will prevent any significant interruption in service.

{¶6} MCI measured its loss-of-use damages by the theoretical cost of obtaining replacement private-line, point-to-point, DS-3 capacity from other carriers for the duration it took to repair the cable and to normalize traffic on the repaired cable, 14.43 hours. These damages included the cost of creating a pathway around the site of the cut, which involved transfers to other carriers and then back to MCI.[1]

{¶7} But MCI admitted that it was not possible to rent such DS-3 capacity on short notice in the manner described in its loss-of-use calculation. The rental

---

[1] MCI took the position that because the severed cable ran between MCI terminals in separate local access and transport areas, the cost to replace the impacted capacity included: "(1) the cost from the local exchange carrier ("LEC") in Cincinnati to transport the traffic from the MCI terminal in Cincinnati to the local exchange carrier ("LEC") to the alternate long distance carrier's ("IXC") terminal in Cincinnati; (2) the cost from an alternate IXC to transport the traffic between Cincinnati and Dayton; and (3) the cost from the LEC in Dayton to transport traffic from the alternate IXC's terminal [to] MCI's terminal in Dayton."

market for DS-3 capacity involves a minimum lease term of one year, with a one-time set up fee and recurring monthly charges. To measure its loss-of-use damages, MCI used the comprehensive cost of a one-year lease and then prorated the sum to arrive at loss-of-use damages for 14.43 hours.

{¶8} Barrett challenged MCI's quantification of and characterization of impacted capacity. It was undisputed that due to the design of its fiber-optic network, MCI had been able to automatically and instantaneously reroute most of the dedicated traffic on the impacted transport systems to other parts of its network. Further, MCI presented no evidence that it had paid other carriers to rent substitute DS-3 capacity, or that it had lost any customers, refunded service fees, or paid out on any service guarantees to any of its customers as a result of the cut cable.

{¶9} Barrett moved for summary judgment on all claims, or, in the alternative, for partial summary judgment on MCI's claim seeking damages for the loss of use of the severed fiber-optic cable. With respect to the loss-of-use damages, Barrett argued, in summary, that loss-of-use damages were inappropriate and would result in a windfall because MCI had been able to reroute the telecommunications traffic in its own network that had been designed for and could not have operated without redundancy and MCI had offered no evidence of a monetary loss apart from the cost of repair. Additionally, Barrett argued that MCI had failed to submit proper evidence from which to measure the loss-of-use damages under Ohio law.

{¶10} MCI countered that under Ohio law, where personal or commercial property is negligently damaged but capable of repair, loss of use is a compensable element of damages without proof of a monetary loss. According to MCI, loss-of-use damages may be measured by the reasonable cost of renting substitute property, and

loss-of-use damages are available even if the injured party never rents substitute property and uses its own substitute property.

{¶11} MCI also challenged Barrett's characterization of MCI's redundancy scheme as back up that had been used in the ordinary course of business and, instead, argued that its redundancy scheme had been reserved expressly for use in emergencies like a "spare boat." Finally, MCI contended that it would not reap a windfall where it had invested millions to create its redundancy scheme.

{¶12} The trial court initially denied Barrett's motions, but later reconsidered its decision on loss-of-use damages and entered partial summary judgment for Barrett on this issue. Subsequently, and by agreement of the parties, the trial court entered judgment for MCI on its negligence claim, awarded MCI damages of $10,881.70 for repair costs, and dismissed with prejudice MCI's other claims. This appeal followed.

## II. Applicable Law

{¶13} In a single assignment of error, MCI challenges the trial court's grant of partial summary judgment to Barrett on the issue of loss-of-use damages. MCI argues that Barrett was not entitled to summary judgment where it had submitted evidence that (1) it had lost the use of the severed cable, (2) there had been an interruption in service, and (3) the dedicated restoration capacity to which MCI rerouted a portion of the traffic being carried on the severed cable had been reserved exclusively for use in emergencies like a "spare boat." We review the grant or denial of summary judgment de novo, applying the standards set forth in Civ.R. 56.

### A. Loss-of-use damages

{¶14} The measure of damages in a tort action "is that which will compensate and make the plaintiff whole." *Pryor v. Webber*, 23 Ohio St.2d 104, 263

5

N.E.2d 235 (1970), paragraph one of the syllabus. *See also Mayer v. Cohn*, 12 Ohio App. 134, 135, 31 Ohio C.A. 191 (1st Dist.1919). The existence and measure of loss-of-use damages has been a subject of controversy for the courts, and, as a result, the courts have developed various rules to guide the analysis.

### 1. Real and Personal Property

{¶15} The general rule in Ohio allows loss of use as a separately compensable element of damages when real property and personal property—such as an automobile or airplane—has been tortiously damaged and is capable of repair. *See Stemper v. Campbell*, 155 Ohio St. 1, 97 N.E.2d 25 (1951), paragraph one of the syllabus (real property); *Hayes Freight Lines, Inc. v. Tarver*, 148 Ohio St. 82, 73 N.E.2d 192 (1947), paragraph two of the syllabus (personal property). *See also Perry v. Harris*, 95 Ohio L. Abs. 21, 197 N.E.2d 416, (8th Dist.1964); *Insley v. Mitchell*, 118 Ohio App. 104, 107-108, 193 N.E.2d 427 (10th Dist.1963); *Otte v. American Airlines, Inc.*, 104 Ohio App. 517, 145 N.E.2d 322 (8th Dist.1957); *Glass v. Miller*, 44 Ohio L. Abs. 278, 51 N.E.2d 299 (9th Dist.1940); *Cincinnati Traction Co. v. Feldkamp*, 19 Ohio App. 421, 422 (1st Dist.1924); *Mayer*, *supra*; *Mail Servs., Inc. v. Reid*, 10th Dist. No. 76AP-922, 1977 Ohio App. LEXIS 8273 (Apr. 5, 1977).

### a. Measure of Loss-of-use damages

{¶16} Loss-of-use damages measure the reasonable value of the use of the damaged property. *See Hayes Freight Lines*, *supra*. Generally, loss-of-use damages are not available if the property is a total loss because the owner has been made whole by recovering the full value of the property as of the date of its destruction. *Id.* at 83-84. As discussed in a case involving damage to an automobile, the rationale for allowing loss-of-use damages where property is merely damaged and is capable of repair within a reasonable time is as follows: the owner is only compensated for the

depreciation caused by the damages, not the entire value of the property, and the majority of his capital investment "lies idle" while repairs are made. *Id.* at 84.

{¶17} Loss-of-use damages are measured by the reasonable rental cost of substitute property, if available, or the value of the use to the owner, as demonstrated by net value evidence. With respect to measuring the loss-of-use damages, this court held in *Cincinnati Traction Co. v. Feldkamp*, *supra*, that when an owner is deprived of the use of valuable property that can be replaced, the owner's loss-of-use damages equal the cost of renting substitute property: " 'the expenses of hiring the property which he is forced to substitute for it.' " *Id.* at 422, citing *Weston v. Boston & Me. Rd.*, 190 Mass. 298, 76 N.E. 1050 (1906).

{¶18} In support of this rule, we looked to the law of admiralty, and the United States Supreme Court's decision in *In re Conqueror*, 166 U.S. 110, 127, 17 S.Ct. 510, 41 L.Ed. 937 (1897). In that case, the Supreme Court explained that where the damaged property is a boat, the market value is the " 'sum for which vessels of the same size and class can be chartered in the market.' " *Cincinnati Traction*, 19 Ohio App. at 422, quoting *In re Conqueror* at 127. This replacement-rental-cost measurement contemplates a market for the substitute property.

{¶19} The *Cincinnati Traction* court acknowledged that a replacement rental cost cannot be calculated where there is no readily defined market for a substitute. The court again turned to *In re Conqueror* for the proper measure of damages in those circumstances. We stated that " '[i]n the absence of such market value, the value of her use to her owner in the business in which she was engaged at the time of the collision is a proper basis for estimating damages for detention, and the books of the owner showing her earnings about the time of her collision are

competent evidence of her probable earnings during the time of her detention.' " *Cincinnati Traction* at 422-423, quoting *In re Conqueror* at 127.

{¶20} Courts have followed *Cincinnati Traction's* rule limiting the use of the replacement-rental-cost method to measure loss-of-use damages. *See Perry*, 95 Ohio L.Abs.21, 197 N.E.2d 416; *Indorf v. B.J. McAdams, Inc.*, 5th Dist. No. 5912, 1982 Ohio App. LEXIS 14890, *4 (Nov. 29, 1982); *Baker v. Bays*, 1st Dist. No. 315, 1980 Ohio App. LEXIS 11804 (Feb. 6 1980) (holding that the plaintiff failed to present "any evidence of probative effect on the issue" where the plaintiff presented no evidence of "reasonable rental value of a similar vehicle" and only evidence of gross earnings in an attempt to prove the value of his lost use.)

{¶21} In *Indorf,* the court explained that "replacement rental cost" is the preferred method of calculating loss-of-use damages because it is easier to calculate the loss. Replacement rental cost is an approximation of lost profits without the extra work, but "[i]f there is no vehicle available for hire," then the net "value of the use to the owner becomes the appropriate measure of damages." *Indorf* at *4-*5.

### b. Use of a Substitute

{¶22} A plaintiff may recover loss-of-use damages even though the plaintiff had not rented substitute property during the time of the repair. In *Mayer v. Cohn*, this court held that "[i]f one is wrongfully deprived of the use of a chattel through the tort of another, the proper measure of damages includes compensation for the loss of use proximately caused by the tort. There is no good reason why the injured party should be required to hire another chattel in order to establish the value of the use." 12 Ohio App. at 135, 31 Ohio C.A. 191. *See also Perry, supra.*

{¶23} Generally, a plaintiff may recover loss-of-use damages when the plaintiff has not rented substitute property but purchased a substitute instead to

keep the business going. *See Mail Servs., Inc. v. Reid*, 1997 Ohio App. LEXIS 8273. In *Mail Serv.*, the defendant had negligently damaged a truck used in the course of the plaintiff's business. The plaintiff had not leased a substitute truck during the time of repair; instead, it had purchased a new truck and had put it into service, "as the vehicle was immediately required for the business of the plaintiff." *Id.* at *5. At trial, the president of the plaintiff company testified that the company had previously leased trucks in the course of its business and that he knew the current costs of truck rental. He then testified that the fair rental value of a truck in his business would be $22 per day, plus mileage at the rate of 22 cents per mile, generally 150 miles per day for his company. *Id.* at *2.

{¶24} The trial court awarded the company loss-of-use damages based on the sum of the base rental rate and the mileage rate for the 44 days that the truck had been out of use. *Id.* at *8. On appeal, the defendant challenged the award of loss-of-use damages and the measure of those damages. The appellate court affirmed an award of loss-of-use damages even though the plaintiff had procured its own replacement by purchasing another truck to keep the business running.

{¶25} The appellate court, however, refused to award damages for expenses saved. Thus, the court limited the loss of use award to the base rental rate of a substitute truck during the reasonable time for repair, and it did not allow the plaintiff to recover the mileage rate. The court explained that "this additional element of damage was for that which had not been occasioned or consumed by the plaintiff in that the truck was in the repair shop and did not use any fuel and ran no amount of mileage * * *." *Id.* at *8.

{¶26} In summary, these cases demonstrate that Ohio recognizes loss of use as an a element of compensatory damages when real property or personal property

such as an automobile has been damaged by the negligence of another, provided that the property can be repaired in a reasonable period of time. The plaintiff is not required to rent a substitute to be entitled to loss-of-use damages or to measure the loss-of-use damages. When a substitute is not available for rent, a "replacement-rental-cost" value may not be used to calculate damages, and "the value of the use to the owner" is an appropriate measure of damages. Finally, a plaintiff may not recover loss-of-use damages for expenses that he saved because the property could not be used, and he may not measure the loss of the use by gross revenues.

### B. The Boat cases: *The Cayuga* and *Brooklyn Terminal*

{¶27} In addition to the Ohio law on damage to real or personal property, the parties relied on principles of damages law set forth in two admiralty cases, *The Cayuga*, 5 F.Cas. 326 (E.D.N.Y.1868), *affirmed* 5 F.Cas. 329 (C.C.E.D.N.Y.1870), *affirmed*, 81 U.S. 270, 20 L.Ed. 828 (1872), and *Brooklyn Eastern District Terminal v. United States*, 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240 (1932). In *The Cayuga*, the court allowed the plaintiff to recover loss-of-use damages even though the plaintiff had used its own "spare boat" to mitigate its damages instead of hiring a substitute.[2] Importantly, the owners of the Cayuga "ha[d] chosen to submit to the loss of the use of the substituted boat during that portion of the year when their other boats [were] not disabled." *The Cayuga*, 5 F.Cas. at 331.

{¶28} The *Cayuga's* "spare boat" doctrine was explained and distinguished in *Brooklyn Terminal.* In that case, a dredge collided with a tugboat used to pull car floats for railroads. The tugboat owner worked its remaining fleet of tugs overtime

---

[2] With respect to the measure of the loss-of-use damages, the *Cayuga* court accepted testimony based on the actual value of the boat's use from witnesses qualified "to know the actual result of the employment of a ferry-boat for any given period" because there was no "market price fixed by various transactions between various persons" for the use of that class of vessel. *Cayuga* at 327.

instead of hiring a substitute for the damaged one. The owner then sought damages for the expense of renting a substitute boat for every day the tug was withdrawn for repairs, relying on the "spare boat" doctrine.

{¶29} Justice Cardozo, writing for the court in *Brooklyn Terminal*, refused to extend the spare boat doctrine "to boats acquired and maintained for the general uses of the business," instead limiting the doctrine to an extra boat kept in reserve for an emergency. *Brooklyn Terminal* at 176-177. The court viewed the tugboat owner's actions as compliant with its need to minimize its damages, and it ultimately affirmed the appellate court's decision excluding the market hire of a replacement tug from the award of damages. *Id.* at 177.

{¶30} Ultimately, the court recognized that a plaintiff cannot be awarded a windfall—costs that it saved cannot be charged to the tortfeasor as if they had not been saved. The case supports a rule that loss-of-use damages cannot be "measured by expenses that were never incurred, but that might have been incurred and charged to the [defendant] if the necessities of the business had been something other than what they were." *Id.* at 173.

### C. Damage to Utility Facilities in Ohio

{¶31} Although loss-of-use damages are generally available in cases involving negligent damage to real or personal property, their availability when a contractor negligently damages utility facilities is not so well-settled. Based on our review of the case law, utility plaintiffs have rarely requested loss of use as an element of damages.

{¶32} In a case where an electric company's circuit transmission tower had been damaged by a gravel company, the trial court noted that "other than as part of the power grid, the transmission tower had no independent fair market value."

*Columbus & S. Elec. Co. v. J.P. Sand & Gravel*, 22 Ohio App.3d 98, 99, 489 N.E.2d 830 (10th Dist.1985). The court then held that the formula for damages was the direct cost of repairs to restore the damaged tower to pre-damage condition and the indirect overhead costs of the repair, where those expenses are established by competent and accurate evidence and limited to an amount necessary to make the plaintiff whole. *Id.* at 100; *Ohio Bell Tel. Co. v. Vaughn Bldg. Co.*, 10th Dist. No. 83AP-1093, 1984 Ohio App. LEXIS 11645 (Nov. 20, 1984); *see also Warren Tel. Co. v. Hakala*, 105 Ohio App. 459, 152 N.E.2d 718 (11th Dist.1957); *Cincinnati Bell, Inc. v. Hinterlong*, 70 Ohio Misc. 38, 437 N.E.2d 11 (M.C.1981). In *Vaughn Bldg.*, which involved damage to underground telephone conduits and cables caused by a negligent excavation, the court suggested that the utility may be awarded for lost revenue.

{¶33} One court held that to avoid overcompensating the plaintiff, "the measure of damages for the negligent destruction of a utility pole is the cost of the pole and the facilities attached thereto based on reproduction cost less accrued depreciation of the damaged pole and the facilities attached thereto." *Ohio Power Co. v. Zemelka*, 19 Ohio App.2d 213, 216, 251 N.E.2d 2 (7th Dist.1969). *See also Cincinnati Gas & Elec. Co. v. Brock*, 1st Dist. No. C-830137, 1983 Ohio App. LEXIS 11225 (Dec. 21, 1983).

D. Damage to Telecommunications Cable

{¶34} The parties have identified three decisions applying Ohio law to a claim for loss-of-use damages arising out of a negligently severed telecommunications cable. The plaintiffs in these cases sought damages for the loss of use of a damaged cable as measured by the theoretical value of renting substitute capacity that it had not actually needed. The plaintiffs relied on the case law

involving compensatory damages for detaining or preventing the use of real or personal property. Although these cases are not binding authority, we review them to determine their persuasive authority.

{¶35} In the earliest case, *Ohio Bell v. Buckeye Directional Boring*, Franklin C.P. No. 01CVH03-2230 (Mar. 15, 2002), the defendant negligently damaged a telephone company's underground cable and conduit, but no interruption in service, loss of revenue, or refunds resulted. The plaintiff moved for partial summary judgment on the issue of whether it could recover any loss-of-use damages.

{¶36} The trial court characterized the plaintiff's claim for loss of use as one for loss of use of real property and determined that the fair rental value of plaintiff's facilities during the restoration period could be a reasonable measure of the loss of use, even though the plaintiff had not rented a substitute. *Id.* Although the court granted the plaintiff's motion, the court reserved judgment on whether the plaintiff's evidence of fair rental value of its facilities comported with the goal of tort remedies to make an injured party whole but not to place that party in a better position than it would have enjoyed had the wrongful conduct not occurred. *Id.*

{¶37} The United States District Court for the Northern District of Ohio addressed a similar loss of use issue in *MCI Worldcom Network Servs., Inc. v. W.M. Brode Co.*, 413 F.Supp.2d 868 (N.D.Ohio 2005). In *Brode*, an excavator inadvertently severed underground fiber-optic cables owned by a telecommunications provider. *Id.* at 869. The cut caused only a millisecond or two of interrupted service because the plaintiff was able to automatically redirect the telecommunications traffic to another pathway within its network through the use of a ring system designed to provide redundancy. *Id.* The plaintiff's customers did not

complain about the loss, if any, of service. *Id.* But the damaged cable could not carry traffic for about eight and one-half hours. *Id.* at 869-870.

{¶38} The plaintiff sought, in addition to repair costs, $883,622.02 for the loss of use of the cable based on "the rental value of substitute capacity" during the time of the repair. Brode moved for partial summary judgment on the claim for loss-of-use damages, claiming that the plaintiff had suffered no damages from loss of use.

{¶39} In granting Brode's motion, the trial court first rejected the plaintiff's claim that the loss of its cable was completely analogous to the loss of use of an automobile. *Id.* at 872-873. The court then found that the plaintiff had built an "ingenious" and "integrated" redundancy system "presumably" to enhance service to the customer. *Id.* at 873. This system allowed it to "forestall" expenses it may have incurred but for the redundancy capability of its network. *Id.* at 874. The court found "compelling" decisions from other jurisdictions holding that loss-of-use damages based on the cost of renting an unneeded substitute were inappropriate based on the rule set forth in *Brooklyn Terminal*. *Id.* at 873, citing *MCI Worldcom Network Servs., Inc. v. OSP Consultants, Inc.*, 78 Fed.Appx. 876 (4th Cir.2003); *MCI Worldcom Network Servs., Inc. v. Lind*, S.D.Fla. No. 00-4407, 2002 U.S. Dist. LEXIS 26467 (Dec. 17, 2002); *MCI Worldcom Network Servs., Inc. v. OSP Consultants, Inc.*, 266 Va. 389, 585 S.E.2d 540 (2003). The *Brode* court noted the *Ohio Bell* decision but determined that the court had "plac[ed] the cart before the horse" and dismissed it as lacking persuasive value. *Id.* at 873.

{¶40} *Wiltel Communications, LLD v. W.M. Brode Co., Inc.*, Summit C.P. No. CV-2004-0301812 (July 29, 2005), is the most recent case applying Ohio law to a claim for loss-of-use damages arising out of a severed telecommunications cable. In that case, the defendant contractor had negligently severed a fiber-optic cable that

14

Wiltel, a telecommunications provider, had leased from MCI Worldcom. Wiltel sought damages for repair cost and the loss of use of its leased fiber-optic facilities, even though Wiltel admitted that it had avoided a substantial interruption in service by rerouting its customer's calls within its own network. Wiltel had also conceded that it had not issued any credits or refunds or paid contract penalties to any of its customers. The court, citing *MCI Worldcom Network v. Brode*, held that loss-of-use damages were not appropriate under those circumstances.

{¶41} After reviewing this case law, we now articulate the basis for our decision upholding the trial court's grant of summary judgment.

### III. Analysis

{¶42} A plaintiff has the burden of establishing its right to damages and the amount of those damages. *See Hayes Freight Lines*, 148 Ohio St. 82, 73 N.E.2d 192. Compensatory damages may not be based on speculation and may not be excessive such that the plaintiff is granted a windfall. *See id.* at 87; *Welch v. Smith*, 129 Ohio App.3d 224, 230, 717 N.E.2d 741 (1st Dist.1998); *O'Brien v. Joseph Mgt., Inc.*, 1st Dist. No. C-960820, 1997 Ohio App. LEXIS 3504, at *5 (July 30, 1997); *Cincinnati Gas & Elec. Co. v. Brock*, 1st Dist. No. C-830137, 1983 Ohio App. LEXIS 11225, at *3 (Dec. 21, 1983).

{¶43} MCI argues that only its right to loss-of-use damages is at issue in this appeal, and not the issue of the proper measure of damages for loss of use. But both of these issues were before the trial court, and we may address both issues in our de novo review. We focus our attention on the appropriate measure of any loss-of-use damages.

{¶44} Loss-of-use damages in commercial cases are intended to measure the loss of the plaintiff's investment—the lost opportunity for making money—during

the time the property is tied up in repairs. *See Hayes Freight Lines* at 84. Theoretically, the value of this loss may be approximated by the cost of renting substitute property or the value of the loss of the use to the plaintiff in its business, generally evinced by looking at the "books" of the plaintiff. *See Cincinnati Traction Co.*, 19 Ohio App. at 422-423. *See also* Brownstein, *What's the Use? A Doctrinal and Policy Critique of the Measurement of Loss of Use Damages*, 37 Rutgers L.Rev. 433, 463-475, (1985). Although measuring loss-of-use damages by a replacement rental cost is a more convenient measure, Ohio courts have long held that it is not an appropriate measure in commercial cases where there is no market to rent substitute property. *See Indorf,* 1982 Ohio App. LEXIS 14890, at *4-5.

{¶45} MCI proposed damages calculated on the cost of renting substitute capacity, but it is undisputed that this market does not exist. The minimum rental period for capacity is one year, and there is no evidence that MCI could have aligned its network with that of another provider in a timely fashion to actually rent capacity. In addition to the logistical difficulties that have prevented the creation of a market, there are economic reasons. It makes no economic sense for a telecommunications provider such as MCI to rent substitute capacity for one year when a cable repair may be completed in a matter of hours. Although MCI has prorated the rental costs, it has not overcome the fact that the prorated amount is based on a market that does not exist. The prorated amount, therefore, is based on speculation.

{¶46} Further, it is readily apparent that using MCI's measure of damages would overcompensate MCI for any loss of use. The calculation includes costs that have no relationship to any losses MCI may have incurred during the repairs from its inability to use the lost capacity for financial gain. These costs include the one-time set-up fee and the cost of connecting through a local exchange carrier. Thus, the

measure of damages proposed by MCI includes costs that MCI would never have incurred.

{¶47} Although Ohio case law suggests that a plaintiff may choose how to measure its loss-of-use damages, that rule applies only where there is an actual market for a substitute. *See Indorf.* Not only is it preferable under these circumstances to calculate MCI's lost opportunity by the value of the use to MCI, we believe that Ohio law requires it. *See Cincinnati Traction*, 19 Ohio App. at 422-423. And MCI has not presented a justification for departing from these well defined rules that apply to the existence and measurement of loss-of-use damages, except to argue that the negligent excavators should be punished. We note, however, that loss-of-use damages are designed to compensate a plaintiff only to the extent required to make the plaintiff whole. Therefore, we reserve for the legislature MCI's argument that loss-of-use damages should punish negligent excavators.

{¶48} MCI failed to present proper evidence from which to measure any damages resulting from the loss of use of its negligently severed fiber-optic cable. For this reason, we hold that the measure of damages MCI proposed is entirely too speculative and would grant a windfall, and it is not allowed under Ohio law.

{¶49} Whether MCI's substitute capacity is the functional equivalent of a spare boat or whether MCI wholly mitigated its losses due to the design of its redundancy scheme used in the ordinary course of business are issues that we do not need to address.

{¶50} Accordingly, under the circumstances of this case, we determine that MCI was not entitled to the loss-of-use damages it claimed. Thus, we affirm the trial court's judgment.

Judgment affirmed.

**DINKELACKER, P.J.**, and **HILDEBRANDT, J**., concur.

Please note:

      The court has recorded its own entry on the date of the release of this decision.