KONINKLIJKE LUCHTVAART MAAT-
SCHAAPIJ, N. V. (K.L.M. Royal Dutch
Airlines), Plaintiff-Appellant,

v.

UNITED TECHNOLOGIES CORPORA-
TION, United Aircraft Corporation,
Taylor Forge Division, Energy Products
Group, Gulf and Western Industries Inc.
and Titanium Metals Corporation of
America, Defendants-Appellees.

No. 627, Docket 78–7553.

United States Court of Appeals,
Second Circuit.

Argued April 9, 1979.

Decided Dec. 4, 1979.

Frank A. Silane, New York City (George N. Tompkins, Jr., and Condon & Forsyth, New York City, of counsel), for plaintiff-appellant.

Benjamin Haller, New York City (Hill, Betts & Nash, New York City, of counsel), for defendant-appellee United Technologies Corp.

Joseph A. Cohen, New York City (Alexander, Ash, Schwartz & Cohen, New York City, of counsel), for defendant-appellee Titanium Metals Corp. of America.

Maurice L. Noyer, New York City (Einar M. Rod and Haight, Gardner, Poor & Havens, New York City, of counsel), for defendant-appellee Taylor Forge Div., Energy Products Group, Gulf and Western Industries, Inc.

Before OAKES and GURFEIN, Circuit Judges, and PIERCE, District Judge.*

GURFEIN, Circuit Judge:

This is an appeal from the judgment of the United States District Court for the Southern District of New York (Hon. Edward Weinfeld, Judge) adopting the report of Magistrate Schreiber and dismissing appellant's complaint on the merits. Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332. Connecticut law was applied.[1] Appellant, known in the United States as KLM Royal Dutch Airlines (KLM), is an international airline carrier incorporated under the laws of the Netherlands. Appellees are American corporations.

On December 22, 1973, a DC–8–63 aircraft leased by KLM experienced an engine

---

* Honorable Lawrence W. Pierce, U.S. District Judge for the Southern District of New York, sitting by designation.

1. There was some dispute between the parties below concerning the appropriate choice of law. Appellant urged that the law of Connecticut should be applied, while appellees contended for the law of New York. The Magistrate to whom the case was referred determined to apply the law of Connecticut under the "governmental interests" rule, *see Dym v. Gordon*, 16 N.Y.2d 120, 124, 262 N.Y.S.2d 463, 209 N.E.2d 792 (1965), since the engine was manufactured in that state. But he thought, and the parties have apparently stipulated, that the law of Connecticut is not materially different from the law of New York on the issue presented for decision. In any event, appellees have not challenged the Magistrate's determination that Connecticut law applies, so we shall also apply Connecticut law. We agree that New York law is not materially different, however, and shall discuss it to the extent that it is relied on by the parties and bears on the issues involved.

explosion prior to takeoff at Schipohl Airport in Amsterdam, the Netherlands. The explosion was allegedly caused by a defective compressor hub; it resulted in damage to the engine and aircraft. The aircraft was out of service for repairs until February 2, 1974—a period of 42 days which happened to coincide with the oil embargo of 1973–74 and the accompanying international fuel shortage.

Appellant filed this products liability action against appellees, each of which participated in the design and manufacture of the engine. The complaint sought damages of $1,500,000 plus interest from the date of the accident. After discovery, the parties agreed to settle appellant's claim for the cost of repairs (without admission of liability), to postpone trial on the issue of liability, and to proceed initially with trial on KLM's claim for damages from loss of use of the damaged aircraft. The parties stipulated that the preliminary trial on the quantum of damages be held before United States Magistrate Schreiber as Special Master.

After trial on the damage issue, Magistrate Schreiber filed a report and recommendation which was adopted in its entirety by the District Court. The report found against appellant on the claim for loss of use of the aircraft. The Magistrate first concluded that appellant was not entitled to collect damages for loss of use unless it could demonstrate "actual pecuniary loss." The report then rejected appellant's contention that it did in fact suffer such pecuniary loss or, in the alternative, that it was entitled to damages based on what appellant would have had to pay to rent a substitute aircraft. Appellant claimed damages of $725,379 for actual financial loss or, alternatively, $680,332 based on the cost of hiring a substitute for 42 days. The prorated amount of appellant's actual lease on the grounded aircraft was $265,020.

In attempting to demonstrate its first alternative theory that it suffered actual financial loss as a result of the loss of its aircraft, appellant relied on the following items of damage: 1) rental payments made for the aircraft while it was out of service, 2) increased operating costs because appellant was unable to substitute the grounded aircraft for larger jets on certain runs, and 3) additional revenue that could have been earned if the damaged aircraft had been available to carry passengers.

The Magistrate first concluded that the rent for the aircraft could not be considered a financial loss because KLM "was required to pay that lease expense whether [the aircraft] was available or not," and thus an award of damages for rent would be contrary to the rule that a plaintiff "has no right to be placed in a better position than [it] would be if the wrong had not been done," quoting *Baker v. Drake*, 53 N.Y. 211, 217 (1873).

The Magistrate next rejected KLM's claim for damages calculated from increased fuel costs caused by its inability to substitute the relatively economical DC–8–63 aircraft for the less economical wide-body jets which appellant continued to use on many of its flights during the repair period. He found this calculation too speculative, since KLM failed to prove that there had been any "clear corporate policy to make such substitutions" and since KLM continued to advertise its use of wide-body aircraft during this period as a means of attracting customers.

The claim for lost revenues was also rejected for lack of proof. Appellant contended that fuel shortages caused by the OPEC oil embargo in 1973 had necessitated cancellation of many scheduled flights and that the availability of another more fuel-economical DC–8 aircraft would have reduced the number of cancellations. It was assumed that reduced cancellations would mean increased revenues. The Magistrate, however, found that this inference was unsupported. He noted that the records of passenger reservations from the relevant period had not been produced and that there was thus "no exact way to establish whether KLM's flight cancellations actually earned or lost revenue for the airline." Indeed, the evidence showed that the airline, due to low load factors, had actually been

running up substantial losses on many of its flights and that the company had adopted a policy of cancelling the flights with the lowest occupancy first. The report concluded that "it is probable that many, if not most, of the flights cancelled by KLM would have lost money had they flown."

The Magistrate also rejected appellant's alternative theory that it was entitled to receive as damages the rental value of a substitute aircraft, since there was no evidence that KLM had actually hired a substitute or that KLM had suffered financial loss as a result of not hiring a substitute. In this respect, the Magistrate relied on Justice Cardozo's opinion in *Brooklyn Eastern District Terminal v. United States*, 287 U.S. 170, 175, 53 S.Ct. 103, 77 L.Ed. 240 (1932), for the proposition that the cost of a substitute vehicle may not be recovered by a commercial entity where a substitution is not actually made and where there is no proof that financial loss was incurred for the time that the damaged vehicle was out of service.

KLM's chief contention on appeal is that the Magistrate erred by relying on what KLM characterizes as "the erroneous legal principle that to recover KLM was required to show that it had suffered a financial detriment."

■ It is an anomaly of federal jurisprudence that in an age of intercontinental air travel we must resort to state law which is historically based upon the loss of use of a horse. Under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), we must apply a state law of damages when an aircraft is put out of use by the negligence or breach of warranty of the manufacturer. The state law that we must apply to the damaged jet in this case was first applied to injured horses and then to damaged automobiles. It is our task to find the locus of the wrong and to assess damages according to the tradition of the state. The principles of law, though scarcely immutable, do tend to survive the advances of technological improvement in their answer to the perennial question of how damage should be compensated. In this case, whether we apply the law of Connecticut or the law of New York, each of which proceeds on the same conceptual basis, *see Cook v. Packard Motor Car Co.*, 88 Conn. 590, 92 A. 413 (1910); *Parilli v. Brooklyn City R.R.*, 236 App.Div. 577, 578, 260 N.Y.S. 60 (1932), we reach the same result.

■ When a vehicle is damaged, general damages are recoverable for the difference in value of the vehicle before the injury and after repairs have been made. This difference may be measured by the cost of repairs. These general damages are not in issue on this appeal since appellant's claim for such damages has been settled.

Applying state law, we must decide whether damages can also be awarded for deprivation of use and what must be shown to qualify for such damages. *See* D. Dobbs, Remedies § 5.11 at 383–90 (1973); C. McCormick, Handbook of the Law of Damages 470–76 (1935).

The theory of the Connecticut and New York cases is that loss of use is an element of damage compensable as a separate item from the cost of repair. *Anderson v. Gengras Motors, Inc.*, 141 Conn. 688, 109 A.2d 502, 504 (1954); *Mastrianni v. Apothecaries Hall Co.*, 109 Conn. 376, 146 A. 819, 820 (1929); *Hawkins v. Garford Trucking Co.*, 96 Conn. 337, 114 A. 94, 95 (1921); *Parilli v. Brooklyn City R.R., supra*. Such loss of use is compensable regardless of whether there is any proof of financial loss. *Cook v. Packard Motor Car Co., supra*, 92 A. at 415–16; *Dettmar v. Burns Brothers*, 111 Misc. 189, 192, 181 N.Y.S. 146 (N.Y.App.Term 1920). The cases have pointed out that it would make no sense to require proof of financial loss when a pleasure vehicle is involved, and it is clear that the same standard is to be applied to commercial and pleasure vehicles alike. *Cook v. Packard Motor Car Co., supra*, 92 A. at 415; *Anderson v. Gengras Motors, Inc., supra*, 109 A.2d at 503; *Dettmar v. Burns Brothers, supra*, 111 Misc. at 191–92, 181 N.Y.S. 146. *See Central Greyhound Lines v. Bonded Freightways*, 193 Misc. 320, 323, 82 N.Y.S.2d 671 (N.Y.Sup.Ct. 1948). Rental value may provide a measure of loss of use damages even though a sub-

stitute vehicle has not actually been hired. *See Longworth v. McGrath*, 108 Conn. 738, 143 A. 845 (1928); *Naughton Mulgrew Motor Car Co. v. Westchester Fish Co.*, 105 Misc. 595, 597–98, 173 N.Y.S. 437 (1919).

■ The theory behind the allowance of damages for loss of use is that it is not the actual use but the *right to use* that is compensable. This is as true when the damaged property was employed in a commercial enterprise as when it was devoted to use for pleasure. An owner has the right to employ the vehicle in an attempt to make a profit whether he succeeds in making it or not. It is his prerogative as an incident of ownership to gamble on the use being productive. It is no answer then to say to the victim of the tort: since you have failed to prove that you would have made a net profit from use of the damaged property, you may take nothing. For it is the right to use that marks the value. *Cf. Cook v. Packard Motor Car Co., supra,* 92 A. at 415–16.

■ The cases generally deal with use as an incident of ownership. When the vehicle is owned, a court will inquire into its rental value during the time it is out of use for repairs. The rental value is estimated first and then, where an automobile is involved, there is deducted the cost of the fuel required to make it run, other overhead, and the wear and tear, or depreciation. *See Anderson v. Gengras Motors, Inc., supra.*

When the chattel is leased, authority is sparse. Yet the actual rental paid should be no less a measure than a rental that is hypothetical. The actual rental is a clear indication of what the lessee, bargaining in an open market, was willing to pay for the right of use. Once it is accepted that a substitute vehicle need not, in fact, be hired, the rental value to be found is not that of the hypothetical substitute, but of the damaged vehicle itself during its time of idleness.

■ In this case the measure is readily available in that a specific amount was paid as rental for the DC–8–63 during the 42 days when it was out of service. Appellant contended, it is true, that the long-term lease should be viewed in substance as an installment purchase contract and that payments were linked to a percentage of the purchase price rather than to the value of use over time. We think the lease payments would be a satisfactory measure in any event since it is evident that they were scaled over the usable life of the aircraft. This is a "rough and ready" measure of the value of its use, in keeping with the principle laid down by the leading Connecticut case of *Hawkins v. Garford Trucking Co., supra,* 114 A. at 95:

> No definite general rule can be laid down except that the award by verdict or judgment should be for fair and reasonable compensation, according to the circumstances of each case.

■ Although saved operating costs and depreciation are normally deducted from rental value to arrive at damages for loss of use of an automobile, *see Anderson v. Gengras Motors, Inc., supra,* such costs need not be deducted when a commercial aircraft is involved. With a commercial aircraft there is always the possibility that any operating costs and depreciation saved by loss of use of the vehicle would have been offset by revenues generated if the vehicle had been available, thus making the logic of automatically deducting such saved costs from the amount of damages less apparent. While we treat automobiles and commercial aircraft alike in that no proof of financial loss is necessary to *recover* loss of use damages, *see* cases cited *supra,* the damages for loss of use of a commercial aircraft, particularly a leased aircraft, should not be *calculated* in precisely the same fashion as for an owned automobile. We think that the rental actually paid for the period during which the leased aircraft was out of service is fair and reasonable compensation.

We note that Justice Cardozo's opinion in *Brooklyn Eastern District Terminal v. United States, supra,* relied upon by the Magistrate and by appellees in concluding that appellant cannot recover rental value without showing either that appellant hired a substitute or that it suffered financial loss

by not hiring a substitute, does not govern the case before us. In *Brooklyn Terminal,* a case decided under admiralty law, the Supreme Court denied loss of use damages for a disabled tugboat when there was concrete evidence that the owner of the tugboat was able completely to negate any financial loss by working his other two tugboats overtime instead of hiring a substitute.[2] The Court thus held that the owner was not entitled to loss of use damages when it did not hire a substitute and was able to cover the loss of use with its other vessels.

*Brooklyn Terminal* was an admiralty case and therefore has no direct bearing on the question before us which must be decided under Connecticut (or New York) law. The law of Connecticut and New York does not require a showing of financial loss in order to recover loss of use damages. Thus, there is no reason to suspect that Connecticut or New York would disallow such damages even if it were shown that appellant was able to completely cover its loss by using other jets.

But *Brooklyn Terminal* is distinguishable in any event. In *Brooklyn Terminal,* the owner of the damaged tugboat was able actually to cover his loss of use by working the other two tugboats overtime to tow the same number of car-floats as before. In the instant case, there is no static number of potential passengers comparable to the car-floats in *Brooklyn Terminal.* It is uncertain whether KLM was able to make up for the loss of use of the damaged aircraft by carrying as many passengers as before. There was no proof that KLM used its remaining aircraft overtime or that it was able to carry all available passengers. Nothing in *Brooklyn Terminal* places the burden on the owner or lessee of a damaged vehicle to show that he was *not* able to cover his loss. We would be reluctant to extend the *Brooklyn Terminal* rule to a case such as this in which it is unclear whether or not appellant was able to carry as many passengers without the damaged aircraft.

While there was a limited number of car-floats to be towed by the tugboats in *Brooklyn Terminal,* the number of potential air passengers is far greater and more cyclical. It is a relatively simple matter to determine whether two tugboats are able to tow the same number of car-floats as three tugboats. It is far more complex to determine whether an airline was able to carry all of its potential passengers after the loss of one of its aircraft. In short, it is impossible to say, as one could in the case of the car-floats, that appellant lost no passengers through the unavailability of its damaged aircraft.

■ We take it to be the law of both Connecticut and New York, then, that an owner or lessee of a commercial vehicle may recover loss of use damages based on rental value without proving that he suffered actual financial loss and without proving that he needed a substitute vehicle to cover the loss of the damaged vehicle. There is, accordingly, a measure of damages that the District Court should not have rejected out of hand—a measure based upon rental actually paid during the 42-day period.

KLM, however, seeks more from this appeal. It argues alternatively that it had an actual compensable business loss because it had to cancel flights which the DC–8 could have flown for revenue and because its costs for fuel would have been reduced by the substitution of the DC–8 for the wide-bodied DC–10s and Boeing 747s.

The evidence presented by the appellant establishes that substitutions of DC–8 aircraft for wide-body jets were being made during the repair period. Though the testimony of KLM's witnesses did not establish with certainty that all such substitutions were made to save fuel, the coincidence of a high rate of substitution with the peak of the fuel shortage leaves virtually inescapable the inference that most of the substitutions occurred because of KLM's reduced fuel allotments. The evidence also shows

---

2. As the Court noted, 287 U.S. at 173, 53 S.Ct. 103, the owner of the tug did not claim that he incurred additional overtime costs.

an increased level of flight cancellations. Given the airline's policy of making as many flights during the period as its fuel allotments would allow, it may be assumed that additional substitutions, by saving fuel that could be used for other flights, would have enabled the airline to run a more complete schedule.

Appellant points to evidence showing a difference between the variable operating costs of the DC–8–63 and of the wide-body jets, the greater net revenue that could have been achieved by using the DC–8–63 on transatlantic flights in place of the wide-body jets, the high rate of use of DC–8–63s in appellant's fleet during the winter of 1973–1974, and the number of additional flights that the DC–8–63's fuel savings would have permitted. By substituting the DC–8–63 on the Amsterdam-New York and Amsterdam-Chicago runs for the wide-body Boeing 747s and DC–10–30s that the airline actually used, KLM calculates that it would have (a) saved $181,720 in variable operating costs for the flights that would have been taken over by the DC–8–63, and (b) saved enough fuel to operate additional wide-body flights that could have earned an additional $278,639. These calculations assume a constant passenger load factor, the scheduling of all substitutions on the popular transatlantic flights, rather than on other flights, and the *ready* availability of the aircraft needed to make the additional flights.

The Magistrate found, however, that the evidence was too speculative to establish these damage claims for two key reasons.

▮ First, the evidence did not support the inference that further substitutions would have been made, even if the DC–8–63 involved in this action had been available. There was evidence that on several occasions substitutions were not made despite the availability of DC–8 aircraft. Although some of these instances were explained by other factors, such as the absence of available flight crews or difficulties in scheduling coordination, the trier

was entitled to interpret this evidence as casting doubt on the assumption that physical availability alone would lead to substitution. Moreover, KLM representatives admitted that there was an effort to maintain advertised service on wide-body jets, particularly on flights immediately following ones that had been cancelled. The flight records from the period would also support the inference that KLM logistics planners were reluctant to make substitutions on "premier" flights. Accordingly, it was possible to conclude, as the defendants contended, that the substitution level on transatlantic flights was at or near the "saturation" point, so that additional substitutions would not have been considered desirable from KLM's point of view. And even if the probability of *some* additional substitutions were accepted, it would remain uncertain on the strength of the evidence presented just *how many* such substitutions would actually have occurred.

Second, the evidence did not support the inference that a reduction in the number of cancelled flights would have produced an increase in revenues for KLM. No reservation records were produced at trial that would show what the load factor on the cancelled flights would have been. It was the admitted policy of KLM first to cancel flights carrying the lowest passenger loads. That this policy was effective could be inferred from the increase in average load that the airline experienced during the fuel shortage. It could be inferred, moreover, that some of the cancelled flights, had they flown, would have run losses rather than gains.

We recognize that this case is somewhat complicated by the fact that the oil embargo did force flight cancellations, and that in theory the availability of one or more fuel-economical jets might have reduced somewhat the impact of the shortage on KLM's operations. Nevertheless, our review of the evidence does not persuade us that the District Court was clearly erroneous in finding that KLM's proof of lost revenue or higher

costs was too speculative to warrant acceptance as a proper measure of damages.[3]

The judgment is reversed and the cause is remanded for further proceedings in accordance with this opinion.

---

**3.** We do not apply the doctrine of *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264–65, 66 S.Ct. 574, 90 L.Ed. 652 (1946), because the difficulty of assessing damage was not caused intentionally and because there is no proof that there was any damage from higher costs or lower revenues, rather than merely uncertainty over the quantum of the damage.