**PURCO FLEET SERVICES, INC., a Utah corporation, Plaintiff–Appellant and Cross–Appellee,**

v.

**Judith KOENIG, Defendant–Appellee and Cross–Appellant.**

No. 08CA1677.

Colorado Court of Appeals, Div. III.

Jan. 21, 2010.

Van Cott, Bagley, Cornwall & McCarthy, Stephen K. Christiansen, Salt Lake City Utah; Holland & Hart, LLP, Stephen G.

Masciocchi, Denver, Colorado, for Plaintiff–Appellant and Cross–Appellee.

Spies, Powers & Robinson, P.C., Matthew M. McQuillan, Brendan O. Powers, Denver, Colorado, for Defendant–Appellee and Cross–Appellant.

Opinion by Judge TERRY.

This appeal gives rise to numerous issues that have not previously been decided in Colorado in the context presented here. We consider the requirements for proof of loss of use damages where the damaged chattel was an automobile, customarily leased out for profit by a car rental company. Next, we construe a contract term granting the rental company the right to collect an administrative charge in connection with the damaged car. Finally, we determine whether the Colorado Fair Debt Collection Practices Act (CFDCPA) applies to the attempt to collect loss of use damages and the administrative charge under the circumstances of this case, and whether attorney fees and costs may be awarded in connection with the claim made under that Act.

PurCo Fleet Services, Inc. (PurCo) appeals the summary judgment dismissing its breach of contract claims against Judith Koenig. Koenig cross-appeals the summary judgment in PurCo's favor on her claims under the CFDCPA. We affirm in part, reverse in part, and remand.

## I. Background

Koenig went to the National Car Rental agency located at the Durango Airport, where she rented a car and signed National's standard rental contract. While driving the car, she hit a deer, damaging the vehicle. She then returned the damaged car to National.

PurCo is National's assignee to collect claims on its behalf, including the claim against Koenig here. PurCo's agreement with National allows PurCo to retain fifty percent of the money collected for loss of use of the car and the entire administrative charge collected.

Two weeks after the collision, PurCo demanded payment from Koenig for physical damage to the car, loss of use of the car, and an administrative charge. Koenig's insurer paid on her behalf for the damage to the car, but refused to pay PurCo for loss of use or the administrative charge. PurCo filed suit to collect the unpaid amounts. Koenig counterclaimed, alleging that PurCo's collection activities violated the CFDCPA.

The trial court granted Koenig's motion for summary judgment as to loss of use damages, on the basis that PurCo could not show that, but for the damage to the car, National would have rented it to another customer. The court also granted summary judgment for Koenig on the claim for the administrative charge, reasoning that the administrative charge provision of the rental agreement was an invalid attempt to liquidate damages. However, summary judgment was granted in PurCo's favor on Koenig's counterclaim under the CFDCPA.

## II. Loss of Use

PurCo contends the trial court erred in granting summary judgment to Koenig on its claim for loss of use. We agree.

Contract interpretation is a question of law that is reviewed de novo. *Vu, Inc. v. Pacific Ocean Marketplace, Inc.*, 36 P.3d 165, 167 (Colo.App.2001). To establish a claim for breach of contract, a party must prove the existence of a contract, its relevant terms, breach, and damages. *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo.App.2008). Summary judgment rejecting a breach of contract claim is proper where the party claiming breach cannot prove its damages arising therefrom. *McCammon & Associates, Inc. v. McGraw–Hill Broadcasting Co.*, 716 P.2d 490, 492 (Colo.App.1986) (where special damages had to be proved and plaintiff failed to prove such damages, summary judgment was properly entered).

The contract between Koenig and National contains the following provision:

Loss or Damage to the Vehicle: [Koenig] will pay [National] for all damage to or loss of the Vehicle, based on repair cost or estimated repair cost, at [National's] option, diminished value of the Vehicle as determined by [National], plus ... [Na-

tional's] *loss of use (regardless of fleet utilization) and administrative charges,* regardless of who is at fault.

(Emphasis added.)

Nowhere in the contract is an explanation given of the meaning of "loss of use (regardless of fleet utilization)." Nor is any explanation given as to the manner in which damages for loss of use are to be calculated. The parties concede, and our research confirms, that although this language appears in vehicle rental contracts, the meaning of the phrase "loss of use (regardless of fleet utilization)" has never been litigated in any reported decision.

Koenig argues that PurCo should not recover any amount of damages, because it cannot prove that National incurred a loss. Under the circumstances presented here, we conclude that the requirement to prove an actual economic loss is altered by the "fleet utilization" language in the contract, but that remand is necessary for additional factual development as to whether National incurred an actual, economic loss.

Our review of decisions from around the United States shows there is no uniformity in the way loss of use damages are awarded. Support can be found for a wide variety of approaches. *See* C.C. Marvel, Annotation, *Recovery for Loss of Use of Motor Vehicle Damaged or Destroyed,* 18 A.L.R.3d 497 (1968) (collecting cases).

Many courts that have awarded loss of use damages have done so without discussing their rationale for awarding such damages and the theory underlying the measure of damages. Thus, many loss of use cases give little or no guidance as to which measure of damages is appropriate in a given circumstance. Our own Colorado jurisprudence is less than clear on these points. *Compare Hillman v. Bray Lines, Inc.,* 41 Colo.App. 493, 497, 591 P.2d 1332, 1336 (1978) (awarding reasonable rental rate for damage to semi truck regardless of whether another truck was rented to replace it), *aff'd sub nom. Wise v. Hillman,* 625 P.2d 364 (Colo. 1981), *and Francis v. Steve Johnson Pontiac–GMC–Jeep, Inc.,* 724 P.2d 84, 85–86 (Colo. App.1986) (awarding damages for cost to rent replacement car where none was actually rented), *with Airborne, Inc. v. Denver Air Center, Inc.,* 832 P.2d 1086, 1090 (Colo.App. 1992) (net profits awarded for loss of use of commercial chattel).

To determine the appropriate framework for analyzing loss of use damages here, we begin with a brief examination of the history of loss of use theory as it relates to automobiles and commercial chattels. This historical background informs our understanding of the contract language employed here and aids in our determination of the appropriate theory of damages to be applied. We then address Koenig's contention that PurCo may not recover for loss of use unless it shows an actual loss (which we interpret to mean an actual economic loss), and determine the effect of certain contract language on that issue. We further examine the appropriate measure of loss of use damages applicable in this case, assuming that any may be awarded, and the propriety of the trial court's summary judgment against PurCo on its loss of use claim.

A. Loss of Use of Personal Automobiles

Under traditional damages theory, a party may not recover special or consequential damages unless it proves that it has sustained or will sustain a loss resulting from the other party's conduct. Dan B. Dobbs, *Law of Remedies* § 3.2, at 289 (2d ed.1993); *Francis,* 724 P.2d at 85–86.

This theory has been applied in an unusual manner in the context of loss of use of personal automobiles. Toward the beginning of the Twentieth Century, as the family auto became less of a luxurious rarity and more of a staple item, needed for transport to the owner's job, courts began to award loss of use damages to automobile owners on the theory that there was intrinsic value in the ability to have a car available for use. Alan E. Brownstein, *What's the Use? A Doctrinal and Policy Critique of the Measurement of Loss of Use Damages,* 37 Rutgers L.Rev. 433, 492–95 (1985).

Under this intrinsic theory of loss, the existence of a loss of some (unspecified) magnitude is presumed once the vehicle is unavailable because it is being repaired.

Courts latched onto the cost of renting a replacement vehicle (lease-in rental value) as a readily quantifiable damages measure. Thus, in numerous cases, including in Colorado, the owner of a family auto was awarded lease-in rental value as loss of use damages, even if no replacement vehicle was actually rented. *See Francis,* 724 P.2d at 85–86; *see also* Brownstein, 37 Rutgers L.Rev. at 493–95 nn. 150–54 (collecting cases). The theory for awarding such damages rested on the so-called "egalitarian view," a concept that a car owner who might not be able to afford to rent a substitute should not be penalized for that inability by being denied damages for the rental amount, where a more wealthy owner who was able to rent a substitute might be awarded that element of damages. *See MCI WorldCom Network Servs., Inc. v. Mastec, Inc.,* 370 F.3d 1074, 1078 (11th Cir. 2004).

In *Francis,* though the division stated that the plaintiff (a private person) was required to prove an actual loss, it nevertheless awarded the plaintiff loss of use damages for the cost to rent a replacement car, even though none was actually rented. 724 P.2d at 85–86. The holding of *Francis* appears to reflect the intrinsic loss of use theory based on the egalitarian view.

Over time, the intrinsic loss of use theory gained traction among American courts and commentators. This view is reflected in the comments to Restatement (Second) of Torts sections 928 and 931 (1979), particularly comment b to section 931(a), which states:

> The owner of the subject matter is entitled to recover as damages for the loss of the value of the use, *at least the rental value of the chattel* or land *during the period of deprivation.* This is true *even though the owner in fact has suffered no harm* through the deprivation, as when he was not using the subject matter at the time or had a substitute that he used without additional expense to him.

Restatement (Second) of Torts § 931 cmt. b (emphasis added); *see also* Charles T. McCormick, *Damages* 474–76 (1935) (expressing similar view).

While the principles articulated in the Restatement and comment b have been applied in both personal and commercial contexts, Colorado courts have not previously been called on to decide whether those principles are appropriate in a commercial context such as the one here. Because the vehicle here was used in a commercial setting for the production of income, we turn our attention to the damages principles to be applied to loss of use of commercial chattels.

### B. Loss of Use of Commercial Chattels

While the theory of intrinsic loss permeated decisions concerning family cars, many courts declined to presume a loss when the damaged item was a commercial chattel leased out to others to produce income. Instead, they required that the plaintiff demonstrate an actual, economic loss, rather than just a presumed, intrinsic loss. *See Brooklyn Eastern District Terminal v. United States,* 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240 (1932) (plaintiff needed to prove incurrence of actual loss of the chattel, and no loss could be shown because plaintiff had a substitute vessel that could be used in place of the damaged ship); *MCI WorldCom Network Servs., Inc. v. OSP Consultants, Inc.,* 266 Va. 389, 585 S.E.2d 540, 544 (2003) (no damages awarded for loss of use of cable system because service was rerouted to another part of that system); *but see Koninklijke Luchtvaart Maatschapij, N.V. v. United Technologies Corp.,* 610 F.2d 1052, 1056–57 (2d Cir. 1979) (permitting recovery for loss of use of aircraft where others in fleet were available, and no actual financial loss was proved, based on theory of intrinsic value of right to use chattel; distinguishing *Brooklyn Terminal* on grounds that it was an admiralty case).

Thus, there is significant disagreement among case authorities and commentators as to whether any economic loss, other than a presumed intrinsic loss, needs to be shown to recover for loss of use of commercial chattels.

■ We are persuaded by those authorities holding that, in the context of commercial chattels, a plaintiff must demonstrate an actual, economic loss rather than just an assumed intrinsic loss. It could be questioned why the measure of damages should

be different in a commercial context rather than a private one. In our view, the purpose of awarding loss of use damages in a commercial setting is to compensate the plaintiff for the *lost opportunity to earn income* from the chattel, Brownstein, 37 Rutgers L.Rev. at 479, a consideration which is generally not present in the context of personal chattels. *See Joy v. Giglio,* 208 Okla. 50, 254 P.2d 351, 352 (1953) (unlike the private owner of an auto, the owner who is in the business of leasing it out derives no other usable value from it than the profit realized by its rental); *see also* Dobbs, § 5.15(2), at 889–90 (noting that some litigants attempt to avoid necessity to prove actual economic loss by inappropriately characterizing rental value claims as general damages claims, when they are, in reality, special damages claims for which actual realized losses must be shown); *Hunter v. Quaintance,* 69 Colo. 28, 30, 168 P. 918, 919 (1917) (loss of use damages are special damages); *MCI WorldCom Network Servs. v. Mastec,* 370 F.3d at 1078 (noting party's argument that there is no justification for applying egalitarian theory of loss of use damages in commercial context); *AT & T Corp. v. Columbia Gulf Transmission Co.,* 2008 WL 4585439, *3 (W.D.La. No. 07–1544, Sept. 15, 2008) (magistrate's unpublished report) (under Louisiana law, damages are awarded for loss of use of personal car even where no substitute is rented, on theory plaintiff suffered inconvenience and mental anguish; no such rationale applies to corporations, as "the only losses an entity that is designed to produce profits can suffer are economic losses") (citing *Alexander v. Qwik Change Car Ctr., Inc.,* 352 So.2d 188 (La. 1977)).

■ Thus, we conclude that in order to recover damages for loss of use of a commercial chattel that is normally rented out for profit, its owner must demonstrate that it lost the opportunity to earn income from the chattel.

Because parties are free to contract away certain rights they would otherwise have, *see Krystkowiak v. W.O. Brisben Cos.,* 90 P.3d 859, 865 (Colo.2004) (agreement not to exercise First Amendment rights), we presume that parties may, by contract, modify or elim-

inate the need to show such an actual, economic loss. PurCo here, in essence, argues that certain contract language eliminates any requirement that it prove such a loss. We turn, then, to consideration of that language.

### C. Effect of "Regardless of Fleet Utilization" Language on Requirement to Prove a Loss

■ The contract here states that Koenig is required to pay National's damages for loss of use "regardless of fleet utilization." PurCo argues that this language eliminates the requirement to prove any sort of actual, economic loss. While we conclude this language alters the requirement to prove actual, economic loss, it does not eliminate it entirely.

■ We follow the rules of construction of contract terms. Thus, the words used should be given their plain meanings according to common usage. *State Farm Mut. Auto. Ins. Co. v. Stein,* 924 P.2d 1154, 1156 (Colo.App. 1996), *aff'd,* 940 P.2d 384 (Colo.1997).

Here, the meaning of the individual words is not hard to discern. How those words apply in the situation presented, however, is not plain or obvious. The parties have not provided any information about the drafting history of this language, and our research has revealed no cases where this language has been previously construed. Our construction of this unusual contract language is informed by legal precedents concerning loss of use where other vessels or vehicles in a fleet were available to substitute for the damaged chattel.

In many of the most often cited commercial cases involving fleets of ships and buses, courts declined to award damages where the damaged party was able to utilize another chattel from its fleet in place of the damaged chattel. *See, e.g., Brooklyn Terminal,* 287 U.S. 170, 53 S.Ct. 103 (spare ship); *Mountain View Coach Lines, Inc. v. Hartnett,* 99 Misc.2d 271, 415 N.Y.S.2d 918 (N.Y.County Ct.1978) (spare buses), *aff'd,* 69 A.D.2d 1020, 414 N.Y.S.2d 947 (N.Y.App.Div.1979), *declined to follow by Mountain View Coach Lines, Inc. v. Storms,* 102 A.D.2d 663, 476 N.Y.S.2d 918 (N.Y.App.Div.1984); *see also*

*CTI Int'l, Inc. v. Lloyds Underwriters,* 735 F.2d 679 (2d Cir.1984) (upholding judgment against shipping container company where it could not show it sustained loss of use damages because other containers were available to be used in place of the lost containers).

Given this background, the most reasonable interpretation of the "regardless of fleet utilization" language in National's rental contract is that it is intended to avoid the rule adopted in fleet cases such as *Brooklyn Terminal,* where courts denied loss of use damages because the plaintiff was able to substitute another chattel in its fleet. Thus, we construe the phrase "regardless of fleet utilization" in this contract to mean that National will not be denied loss of use damages just because it might have been able to substitute one of its other rental cars for the damaged car. We are therefore required to presume that National incurred some type of loss by the unavailability of *this particular car* during the period reasonably necessary for repairs. We are also prevented from concluding that National incurred no damages on the sole basis that there may have been other vehicles that could have been rented in place of this car.

Nevertheless, we conclude this contract language does not completely eliminate the need for the owner of a commercial chattel to prove it lost the opportunity to earn a profit from the chattel as a result of the defendant's actions. Thus, PurCo is required to show that National lost the opportunity to earn income here, by showing certain elements of evidence, which we label "loss prerequisites." Those prerequisites are that for each day for which recovery is sought (1) the rental agency location from which this car was rented was open for business (or, if it was not actually open, made cars available to rent on those days); and (2) there was at least one customer who desired to rent a vehicle (even if not necessarily *this* vehicle) to be used on that day. If these loss prerequisites are not met, then there could have been no lost opportunity to make a profit from this car, *even absent Koenig's conduct,* and National (and therefore PurCo) would have incurred no damage. *See Nunn v. Mid–Century Insurance Co.,* 215 P.3d 1196, 1202 (Colo.App.2008) (to recover in claim against alleged tortfeasor, plaintiff must prove actual damages were proximately caused by tortfeasor's violation of duties).

Because PurCo did not have the benefit of our opinion to know of the requirement we announce today to show loss prerequisites, we remand the matter to the trial court to allow PurCo the opportunity to do so, if it can. *See Catholic Health Initiatives Colorado v. City of Pueblo,* 207 P.3d 812, 826 (Colo. 2009) (remanding to give parties opportunity to raise issues and present additional evidence given new rule announced by supreme court). If PurCo cannot present evidence of the loss prerequisites, then the trial court shall enter judgment against it on its loss of use claim. If it is able to do so, however, the trial court shall allow the claim to go forward, and apply the following principles for awarding loss of use damages.

### D. The Measure of Loss of Use Damages

Authorities and commentators have generally adopted interest or rental value as the possible measures of damages for loss of use, and failing proof of either, an award of nominal damages. *See* Restatement (Second) of Contracts § 348(1) (1981) (discussing interest or rental value); Dobbs, § 5.15(2), at 883–84 (discussing interest); *Am. Tel. & Tel. Co. v. Connecticut Light & Power Co.,* 470 F.Supp. 105, 109 (D.Conn.1979) (nominal damages ruled appropriate where plaintiff introduced insufficient evidence from which to calculate loss of use damages). As between rental value and interest, the latter is less often discussed, and probably easier to calculate in a legally appropriate fashion. *See* Brownstein, 37 Rutgers L.Rev. at 508 (interest calculated by determining fair market value of chattel, applying an interest rate, such as statutory rate, to that value for period when chattel is reasonably undergoing repairs, and awarding that interest amount to the damaged party), 535–36 (benefits of awarding interest as measure of loss of use damages include ease of calculation, reduction of litigation, and promotion of settlement).

Because the parties here have argued solely about the appropriateness of rental value as a measure of damages, we do not consider

these other damages measures. However, we see nothing to preclude the parties from arguing their merits on remand.

Numerous courts and commentators have stated that an appropriate measure of loss of use damages is "rental value." *See* Dobbs, § 5.15(2), at 882–83. However, courts have often been unclear about whether the injured party is to be awarded lease-in rental value (the cost of renting a substitute for the damaged chattel) or lease-out rental value (damages to compensate for the lost opportunity to lease the owner's chattel to a third party), and the rationale behind awarding such damages. Brownstein, 37 Rutgers L.Rev. at 447–75.

Here, it is undisputed that National did not need to lease in a replacement vehicle, and PurCo is not seeking the cost of doing so. Rather, PurCo seeks to recover the gross daily rental rate that National would have been able to charge for leasing out the damaged vehicle during the period reasonably necessary for repairs. We conclude that lease-out gross rental value is not the appropriate measure of damages in this circumstance.

█ Where the damaged party's business is the leasing out of its chattel in a profit-making enterprise, and damages are sought for lost rental value, we agree with those authorities indicating that the more appropriate measure of damages is the net profit the owner would have received, had it been able to lease out the damaged chattel during the time reasonably needed for repairs, less any expenses saved by the unavailability of the chattel. *See United Truck Rental Equip. Leasing, Inc. v. Kleenco Corp.*, 84 Hawai'i 86, 929 P.2d 99, 111 (Haw.Ct.App.1996); Dobbs, § 5.15(2), at 888 ("Perhaps [such a] rule would apply to claims by plaintiffs who are essentially in the business of leasing out the chattels in question rather than in business[es] that merely use the chattel. A set of rules of this kind would bring the lost use recovery in chattel cases into line with traditional (but not invariable) understandings of damages law."); Brownstein, 37 Rutgers L.Rev. at 451, 509 & n. 195.

The commentator who has made the most extensive study of loss of use theory, Professor Alan Brownstein, has noted the policy interests in making sure the chattel owner is adequately compensated for its loss, while attempting to ensure that it does not receive a windfall. Brownstein, 37 Rutgers L.Rev. at 451; *see also MCI WorldCom Network Services, Inc. v. Mastec, Inc.*, 995 So.2d 221, 224 (Fla.2008) (purpose of loss of use damages is to compensate, not to punish defendants or bestow a windfall on plaintiffs). Different measures of damages are appropriate in different circumstances, and Professor Brownstein stressed that damages rules need to be flexible enough to meet a wide variety of factual scenarios. Brownstein, 37 Rutgers L.Rev. at 507–08 (noting that "[n]ot much is accomplished by asserting ill-defined concepts such as rental value and expecting them to operate as talismans to provide accurate compensation to plaintiffs").

According to Professor Brownstein, awarding gross rental value of the damaged chattel to its owner would overcompensate for the loss of its use:

> Since rent can only be earned by subjecting a chattel to wear and tear and other forms of depreciation, the plaintiff theoretically receives a windfall by saving these expenses if awarded gross rental income. Therefore, depreciation costs must be deducted from projected rental income to establish the net usable value of which the owner has been deprived.

37 Rutgers L.Rev. at 451; *see also Am. Tel. & Tel. Co. v. Connecticut Light & Power Co.*, 470 F.Supp. at 109. While Professor Brownstein notes that gross lease-out rental value has been accepted by many courts, perhaps because its computational simplicity is appealing, that measure of damages

> lacks any principled justification.... In situations where lease-out rental value did not represent an actual lost opportunity, [its calculation] was also likely to produce a result that bore no relationship to the injury actually sustained by the plaintiff.

37 Rutgers L.Rev. at 462–63.

In addition to whether gross lease-out rental value is appropriate, another issue arises as to whether gross short-term or long-term rental rates should be awarded.

Awarding the gross short-term lease-out rental rate of the chattel—apparently the rate sought to be recovered by PurCo here—may also overcompensate a plaintiff. As Professor Brownstein noted,

> short-term rental rates are extremely high; they are based not only on the general value of the chattel's use to the public, but also on the expenses inherent in making chattels available on demand for limited periods. Short-term rates often constitute many times the cost to the plaintiff of the use of the "lost" chattel, if that use value is computed by dividing the purchase price of the chattel over its useful life and factoring in interest.

*Id.* at 473.

Rather than awarding a gross rental amount to a plaintiff, Professor Brownstein recommends the following:

> If lease-out rental value is to measure accurately actual lost opportunity costs, the plaintiff should only recover the *net* rental value of its chattel. The theory requires the deduction from rental value awards of operating costs, depreciation, and other expenses which would have been incurred even if the accident had not happened and the plaintiff actually had operated the chattel itself or rented it out to a third party.

*Id.* at 479 (emphasis in original) (footnote omitted).

This view finds support in Dobbs, *Law of Remedies,* § 5.15(2), at 888. Comment b to the Restatement (Second) of Contracts section 348(1) also appears to reflect this view. It states:

> *Breach that delays the use of property.* If the breach is one that prevents for a period of time the use of property from which profits would have been made, the loss in value to the injured party is based on the *profits* that he would have made during that period. *If those profits cannot be proved with reasonable certainty* (§ 352), ... *[recovery is also possible if] the fair rental value of the property during the period of delay [is proved].* Damages based on fair rental value include an element of profit since the fair rental value of property depends on what it would com-

mand on the market and this turns on the profit that would be derived from its use. For this reason, uncertainty as to profits may result in uncertainty in fair rental value.

(Emphasis added.)

We understand the exception in comment b (emphasized above) for inability to prove damages with certainty to apply in a context such as that discussed in *Denver Building & Construction Trades Council v. Shore,* 132 Colo. 187, 197–99, 287 P.2d 267, 272–73 (1955). There, a union strike by operators of certain heavy machines prevented use of those machines in the construction of a bridge. The employer, which had a contract with the state highway department to build the bridge, ultimately was able to complete the project and make a profit. The court held that there was no way to allocate to any particular machine, whose use was lost because of the strike, any proportion of the overall profit that could have been made on the project, and thus it was not feasible to measure damages based on lost profits. Therefore, it upheld the trial court's award of rental value of the affected machines to compensate for their loss of use. *Id.* In such a circumstance, it would clearly be appropriate for the damaged party to recover the full lease-in rental cost of a replacement chattel.

We do not believe the exception in comment b applies in a circumstance where the chattel owner is in the business of leasing out its chattel for a profit, as National was here. Where damages based on lease-out rental value in a commercial enterprise are sought, lost profit can usually be calculated with relative ease and certainty, such as the profit that could have been realized by a rental car company from the lost ability to rent out the damaged vehicle to a consumer. In such a circumstance, lost profits less expenses saved is an appropriate measure of damages.

This is the approach to damages taken in *Airborne, Inc. v. Denver Air Center, Inc.,* 832 P.2d at 1090 (awarding net lost profits in action for breach of contract and tort claims arising from damage to airplane). Courts in other jurisdictions have also adopted this approach, most notably in the telephone cable

context. *See Am. Tel. & Tel. Co. v. Connecticut Light,* 470 F.Supp. at 109.

We are persuaded by Professor Brownstein's demonstration that, in the commercial context, any damages award greater than this measure of damages is likely to overcompensate the plaintiff for its loss. While we recognize the significant variety in the methods employed by courts throughout the nation in calculating loss of use damages, *see* 18 A.L.R.3d 497, we conclude that where, as here, the plaintiff is in the business of renting out the chattel for the purpose of earning a profit, and seeks damages based on lease-out rental value, the appropriate measure of damages is the net profit it would have received from rental of the chattel during the time period reasonably needed for repairs, less any expenses saved.

### E. Propriety of Summary Judgment Against PurCo on Loss of Use Claim

■ We conclude the trial court erred in granting summary judgment against PurCo on its loss of use claim.

Summary judgment is only appropriate where no genuine issue of material fact exists. *Boone v. Bd. of County Comm'rs,* 107 P.3d 1114, 1116 (Colo.App.2004).

As we have stated, lost profits less expenses saved is one of the appropriate measures of damages that could be awarded to PurCo for loss of use. The record shows that PurCo did not present evidence of the amount of lost profits it would have earned had the vehicle been available to rent. Nevertheless, PurCo presented evidence from which an appropriate measure of damages could have been derived, and thus summary judgment should not have been awarded against it.

PurCo submitted proof of the gross daily lease-out rental rate it charged Koenig, and argued it should recover that same amount for each day during which the car was reasonably out of service for repairs. Koenig did not dispute that proof, but rather argued that the measure of damages represented by the rental rate was inappropriate. Although the gross lease-out rental rate was not the

appropriate measure of damages to be awarded, as we have noted, it nevertheless is a relevant number from which appropriate damages could potentially be derived. *See Am. Tel. & Tel. Co. v. Connecticut Light,* 470 F.Supp. at 109 (market rental value is an appropriate starting point for determining loss of use damages, although "rental value will not furnish the measure of damages for loss of use" (quoting *Hawkins v. Garford Trucking Co.,* 96 Conn. 337, 114 A. 94, 95 (1921))). Because PurCo submitted some relevant evidence of its loss of use damages, it was error for the trial court to grant summary judgment against PurCo on its loss of use claim. While it is unclear from the record whether PurCo will be able to prove an appropriate measure of damages in accordance with our ruling, on remand, PurCo shall be permitted to submit additional evidence concerning the loss prerequisites and its loss of use damages.

### III. Administrative Charges

■ PurCo contends the trial court erred in granting summary judgment to Koenig concerning its claim for administrative charges. We agree.

As pertinent here, the administrative charges portion of the contract states:

> Loss or Damage to the Vehicle: [Koenig] will pay [National] for ... *administrative charges,* regardless of who is at fault.

(Emphasis added.) Enforcing this language as written would permit PurCo to recover an administrative charge. We disagree with the trial court's conclusion that the administrative charge provision reflects a failed attempt to collect liquidated damages. None of the language typically associated with liquidated damages appears in this provision. *See, e.g., Powder Horn Constructors, Inc. v. City of Florence,* 754 P.2d 356, 365–66 (Colo.1988).

PurCo argues that the administrative charge is to compensate the rental agency for the expenses incurred in processing a damage claim. No manner of calculating such charges is specified in the contract. PurCo states that it calculated the administrative charge for the Koenig vehicle by consulting a schedule that calculates the administrative

charge based on the amount of physical damage to the vehicle. However, no evidence was presented that the schedule was made part of the rental contract, or provided to Koenig at the time she entered into the contract with National.

PurCo has cited legislation from other states that set limits on administrative charges that may be collected by companies in PurCo's position, based on similar rental contracts. Ind.Code §§ 24–4–9–13(9) & 24–4–9–14(c) (limiting administrative charge to 10% of first $1,500 in physical damage); Cal. Civ.Code § 1936(b)(6), (c)(6) (limiting administrative charge to no more than $150 based on sliding scale of physical damages); Nev. Rev.Stat. §§ 482.31535(1)(h), 482.3154(3) (same). No such legislation exists in Colorado, and we decline to contrive a blanket judicial resolution of such an issue. The parties would be better served by bringing this issue to the attention of the General Assembly. *See Scoggins v. Unigard Ins. Co.,* 869 P.2d 202, 205 (Colo.1994) (Colorado courts do not engage in judicial legislation).

We also disagree with PurCo's contention that the trial court should have supplied the contract term that was missing here, namely the amount of the administrative fee that would be charged. It has cited no authority, and we have found none, that would allow a court to supply a contract term defining the measure of such an element of damages in the event of contract breach. In any event, it is clear from the record that the parties never agreed on any manner in which such damages could be calculated, and under such circumstances, it would not be appropriate for the court to supply such a missing term, other than to determine that the fee should be "reasonable." *See, e.g., Bloom v. Nat'l Collegiate Athletic Ass'n,* 93 P.3d 621, 624 (Colo.App.2004) (citing, with approval, various authorities for the proposition that the duty of good faith and fair dealing implied in every contract requires that a party vested with contractual discretion exercise that discretion reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties); *cf. Villa Sierra Condominium Ass'n v. Field Corp.,* 878 P.2d 161, 168 (Colo.App.1994) (it is improper for a court to imply a contract term that amounts to "engraft[ing] upon the agreement a provision not agreed to by the parties").

PurCo attempted to collect a $150 administrative charge from Koenig, and submitted evidence that it had calculated the charge based on a schedule that was not part of the contract. We conclude this constituted some evidence from which the finder of fact could award PurCo an amount for the administrative charge, and thus we reverse the summary judgment entered against PurCo with respect to that fee. The finder of fact may award damages for the fee based on a reasonable sum, to be determined by the fact finder. *Lazy Dog Ranch v. Telluray Ranch Corp.,* 965 P.2d 1229, 1241 (Colo.1998) (determination of reasonableness is largely a question of fact).

## IV. Collection Agency Under CFDCPA

Koenig filed a counterclaim against PurCo under section 12–14–113, C.R.S.2009, which provides for civil liability if a collection agency violates the CFDCPA. She contends on cross-appeal that PurCo is an unlicensed collection agency whose collection activities are governed by the CFDCPA, and thus the trial court was without jurisdiction to consider PurCo's collection action against her. We disagree.

We review issues of statutory construction de novo. *Flood v. Mercantile Adjustment Bureau, LLC,* 176 P.3d 769, 773 (Colo.2008). Our primary responsibility is to effectuate the General Assembly's intent. *Id.* We construe a statute as a whole, giving consistent, harmonious, and sensible effect to all of its parts, and we will not adopt an interpretation that leads to illogical or absurd results. *Id.; see also Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist.,* 109 P.3d 585, 593 (Colo. 2005).

The CFDCPA applies to any collection agency that collects or attempts to collect from consumers who reside within this state for a creditor with a place of business located within this state. § 12–14–102(1)(b), C.R.S.2009. Under the CFDCPA, it is un-

lawful for any person or entity to operate as a collection agency without obtaining a valid license that is issued in accordance with the CFDCPA. §§ 12–14–115(1)(a), 12–14–118, C.R.S.2009. Colorado law precludes unlicensed debt collection agencies from filing any lawsuit to collect a debt. *Commercial Serv. of Perry, Inc. v. Fitzgerald,* 856 P.2d 58, 62 (Colo.App.1993).

The CFDCPA defines a collection agency in relevant part as a person who (1) "[r]egularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another"; or (2) "[t]akes assignment of debts for collection purposes." § 12–14–103(2)(a)(II)(A)–(B), C.R.S.2009. A debt is defined as an "obligation or alleged obligation of a consumer to pay money arising out of a transaction, whether or not such obligation has been reduced to judgment." Section 12–14–103(6)(a), C.R.S.2009.

■ Under the CFDCPA, a collection agency does not include "[a]ny person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent that ... [s]uch activity concerns a debt which was not in default at the time it was obtained by such person." Section 12–14–103(2)(b)(VII)(C), C.R.S.2009. A company taking assignments of debt not in default is not required to obtain a license, although it is subject to the other provisions of the CFDCPA. *Commercial Serv. of Perry, Inc.,* 856 P.2d at 62; *see also Wadlington v. Credit Acceptance Corp.,* 76 F.3d 103, 106–07 (6th Cir.1996) (under similar federal statute, holding that company that received assignment of retail installment sales contracts before they went into default was not a debt collector).

Here, PurCo falls within the exemption found in section 12–14–103(2)(b)(VII)(C) because at the time National assigned the debt to PurCo, the debt was not in default. The only evidence of assignment appearing in the record is a 1998 contract, assigning from National to PurCo all of its claims, rights, or causes of action relating to claims for damage to motor vehicles. Given that this contract predates Koenig's car rental, let alone the damage to the car, by nearly seven years, it is safe to say that the debt was assigned

before it went into default. *Cf.* § 4–9–204(a) & official comments 2, 6, C.R.S.2009 (validating conveyances of security interests in after-acquired property and receivables); Frederick L. Clark, *The Assignment of Unearned Book Accounts,* 75 U. Pa. L.Rev. 695, 689–90 (1926–1927) (assignments of unearned book accounts upheld).

Because of our conclusion, we need not address Koenig's contentions that the debt was in default even before any demand for payment was made on her and that PurCo identified itself as a debt collector.

### V. Attorney Fees and Costs for CFDCPA Claim

■ PurCo next argues that the trial court erred in declining to award its attorney fees and costs incurred in defending against Koenig's counterclaim under the CFDCPA. Koenig contends PurCo is not entitled to recover costs or attorney fees because her CFDCPA counterclaim is not an "action" within the meaning of section 12–14–113(1.5), C.R.S.2009. We agree with PurCo.

Section 12–14–113(1.5) provides:

> In the case of any unsuccessful *action* brought under section [12–14–113], the plaintiff shall be liable to each defendant in an amount equal to that defendant's cost incurred in defending the *action,* together with such reasonable attorney fees as may be determined by the court.

(Emphasis added.) *See also* 15 U.S.C. § 1692k(a)(3) (similar federal provision).

The CFDCPA does not define the term "action." However, we see no reason to create a separate rule for the award of attorney fees and costs based on the fortuity of whether the CFDCPA claim was raised as an initial claim or a counterclaim. Both claims and counterclaims, if proved, entitle the party raising them to affirmative relief. We construe the term "action" in section 12–14–113(1.5) to include both claims and counterclaims brought under section 12–14–113 in a judicial proceeding. *See Levitt Multihousing Corp. v. District Court,* 188 Colo. 360, 364, 534 P.2d 1207, 1209 (1975) ("A counterclaim is just as much an affirmative action as is an original complaint ...."); *see also* § 4–

1–201(b)(1), C.R.S.2009 (defining "action" in Uniform Commercial Code to include counterclaims); C.R.C.P. 41(a)(2) (a plaintiff, by dismissing its own claims under C.R.C.P. 41(a)(1), is not permitted to dismiss counterclaim that can be independently adjudicated; in essence, treating such a counterclaim as a separable "action").

Because Koenig brought an unsuccessful counterclaim against PurCo, the statute entitles PurCo to recover its costs and reasonable attorney fees incurred in defending against that counterclaim. Thus, we reverse the trial court's denial of an award of costs and attorney fees to PurCo on the counterclaim and remand for a determination of such an award.

## VI. Costs Awarded to the Prevailing Party

PurCo next argues the trial court's cost award to Koenig based on the determination that she was the prevailing party constitutes error and should be reversed. Except as noted above concerning attorney fees and costs under the CFDCPA, any award of costs on a prevailing party theory based on other claims is premature, in light of our disposition on the merits. We therefore reverse the trial court's award of fees and costs to Koenig. On remand, the trial court shall determine the merits of the claims that remain, and reconsider its prevailing party determination and resulting costs award. *See Archer v. Farmer Bros. Co.,* 70 P.3d 495, 501 (Colo.App.2002), *aff'd,* 90 P.3d 228 (Colo. 2004).

## VII. Attorney Fees on Appeal

PurCo requests its attorney fees incurred in this appeal, and at a minimum, the fees incurred appealing the trial court's ruling awarding Koenig fees and costs on the unsuccessful CFDCPA claim and denying them to PurCo. We agree that PurCo is entitled to its attorney fees incurred (1) in appealing that portion of the trial court's ruling awarding Koenig fees and costs and denying them to PurCo for defending against Koenig's unsuccessful CFDCPA claim, and (2) in contesting Koenig's cross-appeal of dismissal of that claim. Therefore, on remand the trial court shall determine and award the amount of PurCo's reasonable appellate attorney fees incurred with respect to these issues.

The summary judgment entered against PurCo on its claims for loss of use and administrative charges is reversed, as is the award of costs and attorney fees, and the case is remanded to the trial court for further proceedings in accordance with this opinion. In all other respects, the judgment is affirmed.

Judge DAILEY and Judge ROMÁN concur.